PATTERSON, Justice:
Donald Temple was convicted of embezzlement by the Circuit Court of Adams County and sentenced to five years in the state penitentiary. From that conviction and sentence he appeals to this Court.
On June 24, 1971, Mrs. Doris Green was the owner of the Old Natchez General Hospital and “The Towers,” an antebellum home, in the city of Natchez. On that date she entered into a contract with Donald Temple, an auctioneer, and L. C. O’Ferrell, a realtor, for the sale of the above properties and their contents at an auction to be conducted on July 23, 24 and 25, 1971. By their agreement the real property was to be sold for not less than a specified minimum amount and the antiques located in The Towers would be sold to the highest bidder for cash. The agreement permitted Mrs. Green to remove any of the antiques or other personal property from The Towers if she desired prior to the sale and they were not to be included as items for auction. The agreement contained a provision to pay the real estate broker and auctioneer 10% of the sale prices of the hospital, the equipment therein, the Towers residence and the antiques and personal property sold therefrom. The commissions were to be paid when each sale was completed.
In accord with the agreement, the equipment in the hospital was sold on July 23, 1971. The Towers and the Old Natchez General Hospital were sold on July 24, 1971. The antiques and other personalty located in The Towers were sold on the second day (July 24, 1971) and third day (July 25, 1971) of the auction. The hospital and its equipment were sold for $60,000 for which a $6000 commission was paid to Temple. The antebellum home was sold for $80,000, but the $8000 commission was not paid' on the consummation of the sale due to a disagreement, hereinafter mentioned, that had arisen between the parties though Mrs. Green acknowledged the debt.
The difficulty which resulted in the prosecution of Temple arose from the sale of the antiques in The Towers. Prior to the sale Mrs. Green exercised her right to remove a number of items of personal property from the antebellum home to her new residence. The maintenance of an orderly inventory was further complicated by the exercise of an option in the agreement that others might consign items for sale, resulting in there being nine or ten consignors to the auction conducted at The Towers. The property of Mrs. Green was identified by the absence of any tagging while the property of the other consignors was identified by tag. The movement of items prior to sale, the inclusion of additional consignors and the fact that Mrs. Green’s property was unmarked, led to difficulty, according to the testimony of Temple, in maintaining an inventory of the hundreds of items of personal property sold by him even though he had in his employ five assistants, including a clerk and cashier, to aid in the endeavor.
*837 The sale of the antiques by Temple was conducted in accord with the customs and standards of the auction business, potential purchasers being registered and given a number when they came to the auction site. The items sold were struck off by the auctioneer to the highest bidder by number and were listed on duplicate tear sheets (a soft white copy over carbon beneath which were duplicate sheets). As each sale occurred the clerk recorded on a tear sheet a description of the item sold along with' the buyer’s number and the purchase price. When the clerk had completed these notations, the duplicate tear sheets were transferred to the cashier. The merchandise was then obtained by the successful bidder by presenting his number to the cashier for comparison with the number and purchases on the duplicate tear sheets, and upon payment the sale was concluded.
The record reflects that the auction involved hundreds of items and attracted approximately one hundred or more people each sale day.
The dispute between Mrs. Green and Temple related to an accounting, both as to when it was due and the amount. Mrs. Green testified that an account was due at the close of each sale day, but that Temple’s compliance was nothing more than an excuse for delay. To the contrary, Temple testified that he offered to settle on the last day of the sale, but was advised by Mrs. Green that the accounting could be done at a later time. In either event approximately a month passed before Mrs. Green was furnished any of the records (34 tear sheets) of the sale. After reviewing these records, she was convinced that all of the sales were not reflected by the tear sheets and advised Temple of her dissatisfaction. Thereafter, he produced four additional tear sheets. The proceeds from the sales reflected by the thirty-eight tear sheets were $20,650. Of this sum Temple was admittedly due $2065 (10%) as his commission in addition to the $8000 remaining unpaid for the sale of The Towers.
Although the amount brought by the sale was in dispute, negotiations between the two resulted in Temple giving his check to Mrs. Green for $9000 as partial payment of the sum due her. The check was accepted as partial payment by Mrs. Green on September 2, 1971, but was held until October 25, 1971, when it was deposited to her account. Thereafter the check was returned due to insufficiency of funds in Temple’s account. It .was deposited a second time the following March and was again returned without payment. Temple explained this transaction by testifying he had ample funds in his account for payment at the time the check was delivered, but because of the passage of time he thought Mrs. Green was not going to accept it so he stopped payment on the check.
Mrs. Green and Temple attempted to reach a satisfactory adjustment of their difficulties. To this end negotiations were engaged in between Bill Mosby, a certified public accountant, as Mrs. Green’s representative, and Honorable Joe Zuccaro, an attorney for Temple. An offer of $10,604 in full settlement with payment by cashier’s check was made by Temple. This offer was rejected by Mrs. Green, but she countered with an offer of settlement for $15,000 in cash. This figure was accepted as a compromise agreement, but unfortunately no accord was reached as to the mode of payment. Mrs. Green desired an immediate settlement in cash whereas Temple was wedded to the idea of paying $7500 immediately and the remainder to be paid within six months free of interest.
The difference in manner of payment prevented the adjustment. Temple admitted he was indebted to Mrs. Green in the approximate figure of $10,604, but stated he had agreed to compromise for $15,000 because of the bad publicity he was receiving from the dispute. Following these negotiations attempts were again made by the parties to reconstruct an accounting, but were discontinued when Temple was indicted for embezzlement in March 1972.
*838 The appellant has filed numerous assignments of error for reversal of his conviction, but since we are of the opinion there was insufficient evidence to establish a felonious conversion of the funds received, we do not reach his other contentions.
There can be no doubt that a trust relationship existed between Mrs. Green and Temple. By their agreement and the nature of the auction business, the quick and continuing rhetoric of the auctioneer soliciting ever higher bids from prospective and competing purchasers as he moved from one sales item to another, leads us to the belief that the proceeds of the sale legally flowed into the hands of Temple. The mingling of funds in which each had an interest and which undoubtedly was anticipated by the parties, created a relationship and inference somewhat diverse from that of a normal agency. It is expressed in Restatement (Second) of Agency, section 398, comment c, at 229-230 (1958), as follows:
c. Effect of custom; fungibles. In the case of certain professional agents, such as auctioneers and factors, it is customary, and hence ordinarily understood, that the agent can properly mingle his funds with those of his principal. The business expediency of so doing is especially clear where the amounts received by the agent are small or where there is a series of transactions, in which cases it is usually inconvenient for the agent to keep the fund separate either in specie or by a separate account in a bank. If the funds are properly mingled, the inference is that the agent becomes a debt- or to the amount received for the principal, but that he agrees to maintain enough in the fund to pay the principal, who has a charge upon the fund to the amount of the debt. .
Moreover, Mrs. Green acquiesced in the receipt of funds by Temple during the sale since she was present and voiced no objections to this conduct. We conclude, therefore, that the sale funds properly came into the hands of Temple with the attendant inference that he became a debtor to the principal for the amount due her.
We hasten to state that we do not mean to indicate that Temple’s possession was that of a joint owner or that his possession was such that he had latitude in the use of the funds so as to absolve him of a charge of embezzlement if there were in fact, a wrongful conversion of the entirety of the receipts. Sherman v. State, 234 Miss. 775, 108 So.2d 205 (1959). The right to receive a commission, though it did permit the funds to be mingled under these circumstances, did not grant the prerogative to unreasonably retain or to use the funds in excess of the commission since they were held in trust. The amount of the commission to which Temple was entitled was in controversy and would, we think, restrict his use of the mingled funds since there was danger of using trust monies in excess of his commission.
The essential elements of embezzlement are set out in May v. State, 240 Miss. 361, 127 So.2d 423 (1961), as follows:
The constituent elements of the offense are (1) an agent or trustee (2) embezzling or converting to his own use, (3) . money, or other valuable . . . property of any kind, (4) . intrusted to his care or possession by virtue of his position or employment. Code Sec. 2115; 18 Am. Jur., Embezzlement, Sec. 2. (240 Miss, at 363, 127 So.2d at 425)
The critical issue is whether there was evidence to support the jury’s verdict that Temple converted the trust funds to his own use. Implicit within this question is the recognition that the question of intent to convert must be determined from the facts and circumstances of the particular case. Fairchild v. State, 258 So.2d 254 (Miss.1972); Grantham v. State, 284 So.2d 523 (Miss.1973), the burden of proof, as always, resting squarely upon the state. Barrett v. State, 253 So.2d 806 (Miss.1971).
A meticulous review of the evidence before us reveals nothing more than a *839 debtor/creditor relationship between Mrs. Green and Temple. Her testimony acknowledges that he was entitled to a commission for the sale of The Towers as well as the commission from the sale of the antiques and other personal property when this amount is determined. This testimony is corroborated by that of her accountant who testified there was a legitimate dispute over the amount due each to the other and that the negotiations to settle were made in good faith.
From the above testimony and other evidence not related here for brevity we are unable to discern any evidence to support the jury’s finding of criminal conversion which is an essential to the crime of embezzlement. We therefore conclude the . state failed to meet its burden of proof in this regard and that this cause should be reversed and the defendant discharged. The question of Temple’s accountability for the trust funds and his liability to Mrs. Green is beyond the purview of this opinion.
Reversed and defendant discharged.
GILLESPIE, C. J., and SMITH, SUGG and WALKER, JJ., concur.