SUGG, Justice, for the Court:
The Grand Jury of the Circuit Court of the First Judicial District of Hinds County returned three indictments against the defendant charging that he embezzled $25,-000, $75,000 and $100,000 in money which was the property of the State of Mississippi. On defendant’s motion to consolidate the indictments for trial, the trial court consolidated the indictments charging the $25,000 and $75,000 embezzlements, but not the $100,000 embezzlement. The jury found the defendant guilty on both indictments. Defendant was sentenced to ten years in the Mississippi Department of Corrections on each charge. The judgment provided that the sentences would be served concurrently with four years of each sentence suspended.
The state’s case established that defendant, while serving as Director of the Mississippi State Highway Department, caused a Highway Department Imprest Fund check in the amount of $25,000 and a state warrant in the amount of $75,000 to be issued to a fictitious entity called the Regional Planning Consortium. The Imprest Fund check was dated April 24 and the warrant May 13, 1975.
Defendant deposited the proceeds from the $25,000 Imprest Fund check in the Bank of Mississippi in Grenada to the account of “E. L. Boteler, Sr. or E. L. Boteler, Jr.,” less $10,000 which was deposited in defendant’s Riverdale Farm Account in the same bank.
Defendant deposited the $75,000 state warrant in the Fulton National Bank of Atlanta, Georgia on June 3, 1975 to an account styled “Regional Planning Consortium” with the defendant as the only authorized signatory.
Defendant withdrew $70,000 from the account in Fulton National Bank in two *281 checks for $30,000 and $40,000, leaving $5,000 in the Regional Planning Consortium account, at the time of the trial.
The $30,000 check on the Georgia bank was deposited in the Bank of Mississippi in Grenada to the account of E. L. Boteler, Sr. or E. L. Boteler, Jr. on August 11, 1975. The deposit slip shows that $11,093.15 was deducted for a note payment and interest, leaving a net deposit of $18,906.85. The $40,000 check drawn on the Fulton National Bank by defendant was payable to Greenwood Production Credit Association and applied to his outstanding loan with the Association. The check was delivered to the Association on August 20, 1975 pursuant to a request that defendant make a payment on his loan from outside income because his loan was deteriorating.
Defendant issued ten checks on the account of E. L. Boteler, Sr. or E. L. Boteler, Jr. in the Bank of Mississippi in Grenada from May 1, 1975, to October 4, 1975 in the total amount of $32,433.31. The checks varied in amounts from $7.12 to $7,750.51 and were issued for defendant’s purposes. There was also debited to this account $93.05, $3.05 to pay for personalized checks and $90.00 for credit life insurance.
The state also proved that $10,960.34 was withdrawn by check from the Riverdale Farm account between April 15, 1975 and May 6, 1975, most of the checks being signed by Lee Boteler.
In order to secure the $100,000 in question, Boteler prepared a memorandum dated April 24, 1975 which follows:
MISSISSIPPI STATE HIGHWAY DEPARTMENT
Inter-Departmental Memorandum
TO: Assistant Director-Administration
DATE: April 24,1975
PROM: Director
Subject or Project No: /s/ E. L. Boteler
Regional Planning Consortium 2 Court Square Atlanta, Georgia
Efforts have been exerted for several years to develop a transportation route from Brunswick, Georgia, to Kansas City, Missouri, either as an extension of the Interstate System or as a comparable facility. Those efforts include promotion by a private organization, The Multi-State Multi-Mode Transportation Corridor Association. Its membership consists of individuals, towns along the proposed route and representatives of the States of Missouri, Arkansas, Tennessee, Mississippi, Alabama and Georgia.
There was also a parametric study of the proposed route conducted through the cooperative efforts of all the affected states and the Department of Transportation. This is the only part the State of Mississippi has made any financial contribution to. This study was conducted by a consultant with the State of Alabama selecting and managing the consultant. The study is complete and has been presented to the several states as well as to the Association.
The states mentioned above, with the possible addition of the State of Florida, are now, through their respective Highway or Transportation Departments and using the parametric study, more definitely developing conceptual plans and proposed legislation. It is this effort that Mississippi State Highway Department will need to support financially and is estimated to cost $700,000. At the beginning each state has agreed to put up $100,000, for a total of $600,000. If the State of Florida elects to participate, the total will be $700,000. The Administrative Officer of each participating Department will direct the activities and the Georgia Department will act as Treasurer or Trustee of accounts.
Mississippi’s pro rata part of the funds is now due and you are requested to provide the same from programmed preliminary engineering on U. S. 78. Payment is to be made to:
Regional Planning Consortium
2 Court Square
Atlanta, Georgia
ELB:ly
In his brief, defendant states:
At the trial, the State conclusively established that the defendant had caused a Highway Department Imprest Fund check in the amount of $25,000 and a State Warrant in the amount of $75,000 to be issued to a fictitious entity known as the Regional Planning Consortium in April and May 1975, respectively, and that these funds were ultimately transferred to Boteler’s personal account and/or utilized for his own benefit. Defendant did not dispute these facts, but testified that the checks were issued to repay him for the expenditure of a like amount of cash given to Herschel Jumper, the Highway Department Commissioner for the Northern District. Jumper was given the money for the purpose of funding a lobbying effort in Washington which had as its goal securing Congressional legislation to pay the cost of build *282 ing bridges across the Tennessee-Tombig-bee Waterway.
(References to Abstract Pages Omitted).
The only defense offered was that defendant was acting in good faith, believing that he had a right to reimburse himself for the funds given to Jumper for lobbying purposes, although he recognized and admitted that there was no statutory authority for him to expend funds of the Mississippi State Highway Department for such purposes.
Boteler testified that he gave Jumper, either personally or through an intermediary, $125,000 for lobbying purposes. He said he gave Jumper $25,000 in cash on April 22, 1975, $30,000 in cash on July 22, 1975, and Steve Guyton $30,000 in cash on June 10, 1975 to be delivered to Jumper, who denied receiving any money from the defendant.
Although defendant was not being tried on the third indictment charging him with embezzling $100,000, he injected the third indictment into the trial by cross-examination and by his direct testimony.
According to defendant he received an additional $100,000 by endorsing a check from the Tombigbee River Valley Water Management District, which had agreed to advance engineering funds to the Highway Department, and converted it into four cashier’s checks for $25,000 each, payable to the Regional Planning Consortium. Defendant testified that he deposited one of these checks in the Bank of Mississippi in Grenada and retained the other three in his desk drawer. He further testified that he borrowed $125,000 and reimbursed the state for the $100,000 check from the Tombigbee River Valley Water Management District.
Defendant testified that he was able to give Jumper $125,000 in cash because he had that amount in a closet in his apartment in Jackson. He said his father entered a hospital in 1970 and gave him a black box which contained his important papers, along with $25,000 in cash. He kept the box in his apartment in Jackson. After his father’s death, he entered his father’s safety deposit box and discovered $102,000 in one hundred dollar bills and transferred this sum to his apartment.
In Temple v. State, 288 So.2d 835 (Miss. 1974) we set forth the essential elements of embezzlement in the following language:
The essential elements of embezzlement are set out in May v. State, 240 Miss. 361, 127 So.2d 423 (1961), as follows:
The constituent elements of the offense are (1) an agent or trustee .
(2) embezzling or converting to his own use, (3) . . . money, or other valuable . . property of any kind,
(4) . intrusted to his care or possession by virtue of his position or employment. Code Sec. 2115; 18 Am. Jur., Embezzlement, Sec. 2. (240 Miss, at 363, 127 So.2d at 425). [288 So.2d at 838].
There is no doubt from the testimony in this case that defendant converted the funds to his own use. The state’s case showed beyond a reasonable doubt that the defendant deposited the $100,000, used the money to pay debts, and for other purposes of the defendant. His defense is that he gave Herschel Jumper $125,000 of his own funds for lobbying purposes and repaid himself from state funds. This is not a defense to embezzlement.
In the case of State v. Pratt, 114 Kan. 660, 220 P. 505 (1923) the Supreme Court of Kansas had before it an embezzlement case where a bank president claimed that he used embezzled funds for the benefit of the bank and not for his personal use. The Kansas Court stated:
Appellant offered to show that, because of heavy loans made to some of its directors, the bank of which he was president was hard pressed for funds; that the proceeds from the sale of the bonds and the F. C. Cragg deposit were used for the benefit of the bank, and not for his personal use. These matters do not constitute a defense. The motive which prompted the embezzlement is not material. 20 C.J. 436. The money was applied to the use of appellant, when he used it in the way he wanted to use it. Whether he chose to use it on his personal obligations, *283 or give it to the bank of which he was president, or spend it in riotous living, he directed its disposition, and thereby applied it to his own use. (220 P. at 508).
If defendant could be acquitted of the charge of embezzlement on the defense offered in this case, any embezzler could be acquitted upon a simple showing that he did not retain the embezzled funds for his own use but gave them to another person. Whether the defendant chose to use the money for his personal obligations or give it to Herschel Jumper for lobbying purposes does not matter, because, in either event, he directed its disposition and thereby applied it to his own use. The element of conversion was established.
It is against this factual and legal background that we must consider defendant’s only assignment of error which is stated by him as follows:
Appellant’s trial was rendered fundamentally unfair by gross prosecutorial misconduct, when the prosecution, in defiance of the circuit judge’s order, failed to disclose before trial, that it had in its possession notes of a lengthy statement made by defendant to a State’s witness, and then utilized said previously undisclosed statement to undermine defendant’s credibility, the central issue in the case, by attempting to demonstrate to the jury that the defendant’s prior statement contradicted his sworn testimony from the witness stand in several crucial aspects.
Defendant in his brief with reference to this assignment of error states:
By flatly conceding the conversion of State monies, but asserting that he believed that he had a right to reimburse himself for the cash that he had previously expended for the benefit of the State of Mississippi, the only issue at trial became Mr. Boteler’s credibility, as it reflected upon the state of his mind and the existence or lack of criminal intent.

Accordingly, in presenting his good faith defense at trial, and in attempting to maintain his credibility with the jury, it was crucial that Mr. Boteler be able to demonstrate that his testimony from the witness stand was consistent in every important respect with the version of the decisive events which he had narrated to third parties at or about the time his actions were discovered.
In preparing for the trial, defense counsel had learned that during July, 1976, when the State auditor had uncovered what had taken place, Boteler had spoken to John Tabb, E. L. Shaw and Sam Waggoner about the missing funds. Counsel satisfied themselves that, in each instance, Boteler had described his actions and motives in substantially the same terms that he would from the witness stand. Based upon this consistency of position, counsel fashioned the defense strategy — wholly ignorant of the fact that Boteler had spoken at length to John Hamilton on July 29,1976, that the latter had made contemporaneous notes of the interview; and that the notes reflected Boteler ostensibly telling Hamilton a story very different from the one appellant would relate from the witness stand.
John Hamilton, Director of the State Performance and Evaluation and Review Committee, interviewed Boteler on July 29, 1976. The interview covered the subject of missing funds and also the matter of a contract for design of bridges to cross the Tennessee-Tombigbee Waterway. The question of the contract for design of bridges is not pertinent to this case. Hamilton made notes during the interview in the presence of Boteler which were introduced for identification. Boteler’s contention is that these notes and the testimony of Hamilton based on his notes were devastating to his case because the central issue in the case was defendant’s credibility. Defendant then states in his assignment of error that Hamilton’s testimony contradicted the sworn testimony of defendant in “several crucial respects.” Hamilton’s testimony is summarized in defendant’s abridgment of the record as follows:
Our conversation was in private and lasted about two hours. When I asked him *284 about the $200,000, he said he had given $125,000 to Herschel Jumper in a series of cash transactions. Mr. Boteler said a $25,000 check and a $75,000 check came out of the Imprest Fund. He stated he had given the first $25,000 to Mr. Jumper himself, and deposited the $75,000 in an Atlanta Bank in an account styled “Regional Planning Consortium.” He stated, I believe, that $40,000 of that was transferred to Greenwood Production Association and $30,000 to the Bank of Grenada, leaving $5,000 in the Atlanta account. Mr. Boteler told me that the entire $70,-000 that he had transferred to his personal account, plus $5,000 of his own money had been given to Jumper, and of that amount $30,000 was relayed to Jumper through Steve Guyton. He never mentioned he was paying himself back. Mr. Boteler told me he was personally responsible for $25,000, but that the Commissioners were jointly liable with him for $175,000 as that was part of the Commission minutes. This did not make sense to me because only $100,000 was part of the Commission minutes.
Mr. Boteler said that Jumper wanted the money to promote the Multi-State Multi-Mode project and for lobbying in Washington. He thought the money had gone into local politics and to Washington lobbyists. He further stated that Senator Jennings Randolph, Chairman of the Senate Public Works Committee, ‘takes his pound of flesh from every public works contract.’ Mr. Boteler never mentioned disbursement of any monies in connection with the Tenn-Tom project. He stated he had repaid Hamp King $100,000 and had the other $100,000 in a savings account.
The notes that I made contemporaneously to my conversation with Mr. Boteler reveal that we did discuss the need for funds for the Tenn-Tom bridges. This was just prior to the description of the cash payments to Jumper. Mr. Boteler told me that he gave Jumper a total of $125,000 cash, $30,000 of which was delivered through Guyton. Boteler knew I had the power to subpoena bank records. He told me he put $30,000 in the Grenada bank and then took out the cash and gave it to Jumper, although the bank records do not reveal such a transaction. It did not occur to me that Greenwood Production Credit was not the type of institution Mr. Boteler could have made a withdrawal from. I wrote down what Mr. Boteler told me.
Mr. Boteler stated that $175,000 was approved on the Minutes of the Commission. I did not misinterpret this. Mr. Boteler said that when the second $100,-000 check had come into the Highway Department, he had taken it to a bank and exchanged it for four cashier’s checks and deposited it in his own bank. Boteler told me he then paid that money to Jumper. This is my testimony even though I am aware that this took place in October, 1975, three months after Jumper was defeated in a re-election bid. I did not know what Mr. Boteler meant when he said, ‘Senator Randolph always gets his pound of flesh.’
The notes that Hamilton made during the interview with the defendant contained five references to cash delivered to Jumper but do not show where the cash came from nor the dates on which the payments were made. The notes are not in narrative form and it would be difficult, if not impossible, to reconstruct the conversation between Hamilton and the defendant without Hamilton’s testimony.
Hamilton testified that the payments to Jumper were made out of funds deposited by Boteler but such facts do not appear in Hamilton’s notes, so this testimony would depend on the independent recollection of Hamilton about the conversation. Defendant relies on Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) as support for his argument that the prosecution breached its constitutional duty to disclose exculpatory as well as inculpatory evidence.
The United States Supreme Court in United States v. Agurs, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976) dealt with the suppression of evidence by the prosecu *285 tion that would have been beneficial to defendant’s self-defense theory. The court acknowledged that the prosecution does not have a constitutional duty to routinely deliver its entire file to defense counsel. The court fully recognized the problems that would arise if a policy of unlimited discovery was established and in footnote 20 stated:
It has been argued that the standard should focus on the impact of the undisclosed evidence on the defendant’s ability to prepare for trial, rather than the materiality of the evidence to the issue of guilt or innocence. See Note, The Prosecutor’s Constitutional Duty to Reveal Evidence to the Defense, 74 Yale L.J. 136 (1964). Such a standard would be unacceptable for determining the materiality of what has been generally recognized as “Brady material” for two reasons. First, that standard would necessarily encompass incriminating evidence as well as exculpatory evidence, since knowledge of the prosecutor’s entire case would always be useful in planning the defense. Second, such an approach would primarily involve an analysis of the adequacy of the notice given to the defendant by the State, and it has always been the Court’s view that the notice component of due process refers to the charge rather than the eviden-tiary support for the charge.
(427 U.S. at 112, 96 S.Ct. at 2401-02, 49 L.Ed.2d at 354-55).
We note that the testimony of defendant’s own witness, Sam Waggoner, closely parallels that of the testimony of Hamilton as to the source of the funds from which Boteler gave Jumper $125,000. We also note that defendant was aware of this conversation with Hamilton, saw Hamilton make notes, but apparently, for some reason best known to himself, failed to disclose this information to his attorneys.
We hold that the constitutional requirement of a fair trial was not violated by a failure to deliver the notes to the defendant before trial for the following reasons: (1) The notes standing alone, without explanation, do not reveal either inculpatory or exculpatory evidence. (2) The pretrial discovery order did not require the prosecution to deliver the notes. (3) The defendant was as aware of the existence of the notes as was the prosecution because the defendant saw the notes being made by Hamilton during the interview.
When this case is viewed in its entirety, we reject defendant’s contention that he was not afforded a fair trial because the notes were not delivered to him before the trial. According, to the defendant, he took funds of the State of Mississippi for the purpose of reimbursing himself for personal expenditures which, according to him, were made to enhance the future of Mississippi. As stated infra this was no defense to the crime of embezzlement.
AFFIRMED.
PATTERSON, C. J., SMITH, and ROBERTSON, P. JJ., and WALKER, BROOM, LEE and BOWLING, JJ., concur.
COFER, J., takes no part.