# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2013-KA-02080-SCT

*MICHAEL JAMES BROWN a/k/a MICHAEL J. BROWN*

*v.*

*STATE OF MISSISSIPPI*


| | |
|---|---|
| DATE OF JUDGMENT: | 09/06/2013 |
| TRIAL JUDGE: | HON. JOHN HUEY EMFINGER |
| COURT FROM WHICH APPEALED: | RANKIN COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | OFFICE OF THE STATE PUBLIC DEFENDER BY: GEORGE T. HOLMES |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: SCOTT STUART |
| DISTRICT ATTORNEY: | MICHAEL GUEST |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED IN PART, VACATED IN PART, AND REMANDED - 11/12/2015 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |


**BEFORE RANDOLPH, P.J., KING AND COLEMAN, JJ.**

**KING, JUSTICE, FOR THE COURT:**

¶1.     Michael J. Brown was the attorney for the guardianship of DeMon McClinton, during

which time he embezzled and/or mismanaged more than $1.2 million, much of it in Hinds

County, where the guardianship and ward were located. He gave $550,000 of that

guardianship money to Linus Shackelford as "loans" from the guardianship, the transactions

for said loans culminating in Rankin County. Brown was convicted on two counts of

embezzlement in Rankin County for making those "loans" with guardianship funds. Because the trial court did not commit reversible error during the trial in this case, this Court affirms Brown's convictions and his sentence to a term of years. However, the trial court exceeded its statutory authority with its sentence of restitution; therefore, this Court vacates the restitution portion of Brown's sentence and remands the case for resentencing.

## FACTS AND PROCEDURAL HISTORY

¶2.     DeMon McClinton (DeMon), the son of Thomas McClinton (Thomas) and Rebecca Henry (Rebecca), and the grandson of Dr. Aaron Henry (Dr. Henry), was born on November 30, 1983. In May of 1997, Dr. Henry passed away, leaving his estate, including partial ownership in several television stations, to his daughter, Rebecca. On December 17, 1999, when DeMon was sixteen years old, Rebecca died intestate. At the time of Rebecca's death, a sale of her interest in Civic Communications Corporation was pending. The two beneficiaries of Rebecca's estate were her two sons, DeMon and his brother, Aaron McClinton (Aaron), who was of the age of majority when his mother passed away. Around December 1, 2000, the proceeds of the stock sale, totaling more than $8,000,000, were received by Rebecca's Estate. They were subsequently distributed evenly between DeMon and Aaron.

¶3.     On June 16, 2000, Thomas was appointed as DeMon's guardian by Judge Stuart Robinson of the Hinds County Chancery Court. The order did not require that Thomas post a bond. Consequently, the order thus required that "any guardianship funds obtained will be deposited in a fully insured account at a banking corporation in this state, there to remain

2

until further order of this Court." The court also ordered that a copy of the order "will be provided to the specified banking corporation and its receipt will be filed in this cause and acknowledged in said receipt that said monies are to be withdrawn only upon order from the Court and that said bank agrees to comply with this requirement."

¶4. On February 11, 2001, Linus Shackelford, individually and as president of Lakeland Place, LLC, his cemetery business, and Thomas, as Guardian, executed a promissory note indicating that Shackelford "borrowed $300,000.00 from the Guardianship of Demon B. McClinton at a rate of ten percent (10%), payable three (3) years from the date of this note." The promissory note stated that Shackelford "will give as security 20 acres of developed property and buildings located in Section 15, Township 6 North, Range 3 East, Rankin County, Mississippi, owned by the Borrower as the owner of Lakeland Place, LLC. A deed of trust will be recorded on these 20 acres at a later date." No deed of trust was ever recorded.

¶5. On February 20, 2001, the Estate of Rebecca Henry issued a $1,000,000 check to "Thomas McClinton, Guardian of Demon McClinton, a Minor, and Michael Brown, his attorney" as a partial disbursement of Rebecca's estate for DeMon. It is undisputed that Michael Brown deposited this check into his attorney escrow account, and that the funds never managed to find their way into a guardianship account.[1] The State offered no direct forensic proof of the date on which the check was deposited or the date on which the check

[1]Brown asked DeMon: "I mean, those checks were deposited in my escrow account, is that not true?" Demon responded: "Yeah, they were deposited in your escrow account." Further, Brown admitted that "at some point" the one million dollar check was deposited into his escrow account.

cleared, and Brown claims that the check was deposited in late February or early March, and that the bank then placed a multi-day hold on the check because it was so large. The State's position is that the check was likely deposited shortly after February 20. On February 21, Brown began writing checks off his escrow account for items for Thomas. On that date, he wrote three checks to Blackwell Imports totaling more than $140,000 for luxury cars for Thomas and DeMon, and perhaps for Thomas's fiancé, Lottie Campbell. He also wrote checks for car insurance and car tags. On February 22, 2001, Brown wrote a check from his attorney escrow account to Shackelford for $300,000. The "For" line stated that the check was a "Loan From DBM LLC @ 10% For 3 years." DBM LLC was not actually an LLC, but stood for "DeMon B. McClinton" and was purportedly a "business" that Thomas and Brown allegedly planned would engage in business transactions for the benefit of DeMon.

¶6.     On September 7, 2001, Judge Robinson signed an order regarding the guardianship. The order authorized payment of attorneys' fees to Michael Brown in the amount of $398,000. It also ordered payment of a guardian fee and for the guardian's costs in the amount of $79,293.13. It allowed a monthly allowance of $3,000 to be paid out of the guardianship to Thomas for the benefit of DeMon. The checks to Brown and Thomas were cut on the same day. Also on September 7, 2001, Brown wrote Shackelford a check for $250,000 out of his attorney escrow account. An unsigned promissory note, dated September 7, 2001, stated that Shackelford borrowed $250,000 from Thomas and would repay him at a rate of ten percent in three years.[2]  Like the promissory note for the $300,000 loan, it

_____

[2]The parties and witnesses, including Brown, seem to agree that a negotiated version of the promissory note did at one time exist, but was perhaps destroyed in the two floods

4

pledged land as security and that a deed of trust would be recorded. No such deed of trust was ever recorded.

¶7. On December 23, 2002, Rebecca's estate cut a check for $205,000 to "Thomas McClinton, Guardian of Demon McClinton, a Minor." Brown apparently signed the check for Thomas, as the endorsement says "Thomas McClinton by Michael Brown Attorney for Guardianship," and then he deposited the check into his attorney escrow account.[3]

¶8. On November 21, 2005, attorney Russ Russell filed a "Petition to Compel Accounting by Next Friend" in the Hinds County Chancery Court. The petition noted that Russell had formerly served as counsel for DeMon, but that DeMon had terminated the engagement. The petition stated that a sum of $300,000 was withdrawn from the guardianship in exchange for a loan without order of the court and that the loan remained unpaid. The petition further alleged that $1,000,000 in guardianship funds was never deposited into the guardianship estate, but was deposited into Brown's account and spent by Brown. The petition requested an accounting for the $300,000 and $1,000,000, respectively.

¶9. On August 11, 2006, Judge Robinson signed an order closing the guardianship. No accountings from that time are in the record, nor are any documents regarding the resolution of Russell's petition for an accounting.[4]

---

Brown claims to have had in his office.

[3]Thomas claims that his name was forged on this check.

[4]Judge Thomas testified that several accountings done prior to 2006 were in the trial court record regarding the guardianship, but that they were not adequate, in his opinion. Neither party placed these accountings in the criminal trial record.

¶10.   In 2009, an attorney petitioned the chancery court to reopen the guardianship.  Judge Robinson had retired, and Judge Dewayne Thomas was the Hinds County chancellor to whom the case was assigned.  Then again, sometime in 2010 or 2011, attorney Brent Hazzard filed a motion to reopen the guardianship.  Hazzard petitioned for an accounting of the guardianship funds.  Judge Thomas asked Brown for an adequate accounting, which, after several meetings, had not been completed.  Brown claimed that his offices had flooded twice and his files had been destroyed.  Brown then filed some inadequate "accountings."  For example, on January 20, 2012, Brown filed an accounting, the entirety of which stated:

**Investment Accounting for years 2001 - 2005**

Investments:

$1,000,000.00 (Promissary notes in the amount of $1,000,000.00 to Linus Shackelford, individually and President of Lakeland Place, LLC on Real Estate)

$343,999.53 less expenses = $307,999.53 Cash at TNB mm account

$1,400,000.00 (Promissory note in the amount of $237,745.81 to Linus Shackelford, individually and President of Lakeland Place, LLC) plus TNB mutual fund account.

So, in 2012, Judge Thomas held a formal hearing on the matter.  "Sometime in February" of 2012, Judge Thomas found that Brown had perpetrated a fraud on the Hinds County Chancery Court.  On February 8, 2012, Judge Thomas appointed Paul Rogers as Special Master.  The Special Master's Report noted that "The Special Master was appointed to obtain

6

information from third parties regarding property of this Guardianship and to investigate and report his findings to the Court regarding the receipt, disposition and location of any assets designated for and/or belonging to this Guardianship." Rogers participated in the execution of a search warrant on Brown's office in order to locate documents. Rogers ultimately found that nearly $1.3 million in guardianship funds was deposited into Brown's escrow account, and most of the rest of the guardianship funds were deposited into two different guardianship accounts. Rogers determined that "From the funds that went into the Michael J. Brown escrow account, $550,000.00 was 'loaned' to Linus Shackelford as reflected in the prior hearings and rulings in this case. There has been no accounting for the balance of $740,492.08 which Mr. Brown admits depositing into his escrow account . . . ."[5] Rogers

---

[5]Rogers also found that Brown's affidavit providing that he spent 1,920 hours of legal services on the guardianship, and was due $398,000 in legal fees, was not accurate. He found that 1,950 hours

is an obviously inflated figure. A review of both the court file on the Rebecca Henry Estate and the court file on this Guardianship reveals that times stated on Mr. Brown's Affidavit are contrived, excessive and unnecessary. Contemporaneous time records have not been provided or offered and the times stated have not been substantiated in any manner whatsoever. By way of example, there are many hours of alleged services provided that predate the opening of this Guardianship. This Guardianship was opened on June 16, 2000, at which time 1.3 hours were charged for meeting with Judge Robinson to open the Guardianship which is one of the reasonable time entries. Any time that predates opening the Guardianship, except for preparation of the simple Guardianship pleadings, even if such time was expended, had nothing to do with the Guardianship. Also, there are clearly excessive entries both before and after opening of the Guardianship. For example, there is an entry on January 20, 2000 (five months before the guardianship was opened), of 12 hours to "prepare for hearing" followed by eight hours of attendance at an alleged hearing in Judge Robinson's court on January 21, 2000. There is no pleading or other documentary evidence that these events occurred.

7

noted that Brown had executed a promissory note to the Guardianship which included the $300,000 for the first Shackelford loan. Regarding the accountings presented when the Guardianship was closed in 2006, which, as noted previously, neither party has put into the record in the criminal case, Rogers found them to be "contrived, incomplete and wholly inaccurate." He stated that

> [i]n order to comprise an accounting, there needs to be a listing of all assets coming into the hands of the Guardian, a listing of all disbursements, sales or other dispositions of assets by the Guardian and a summary of all remaining assets along with documentation as to the location thereof such as bank statements, deeds, brokerage statements, etc. No such documentation has been submitted by Thomas McClinton or his attorney.

---

Rogers continues that

> [a]nother example is 14.3 hours alleged to have been spent reviewing estate documents on January 30, 2000. The Special Master reviewed the entire estate files of both Henry estates in about 1 hour. . . . Mr. Brown's affidavit is replete with excessive and fabricated entries. The sale of the Civic stock was being handled by attorneys experienced in such matters and any services claimed to be provided by Michael J. Brown in connection with said sale were neither reasonable nor necessary and would have been merely incidental. Counsel for the Henry Estates confirmed that Michael J. Brown played no necessary or useful role in the sale of the Civic stock or the administration of the Rebecca Henry Estate. If this Guardianship were properly handled with proper petitions and accountings being prepared and presented, no more than 150 hours of attorney time over the term of the Guardianship would be necessary which would result in a fee of $22,500.00 at $150.00 per hour.

Rogers also noted that Brown charged the Guardianship $110,000 for an opinion letter, because that fee represented a percentage of the total value of the asset that was the subject of the opinion. He noted that this was in violation of Uniform Chancery Court Rule 6.11. He also found that the letter was neither necessary nor desired on behalf of the Guardianship, and that Brown's work on the letter consisted of copying another law firm's letter written in connection with the sale of the Civic stock. Rogers concluded that Brown's attorneys' fees "were procured by a fraud on this Court."

¶11.    Brown eventually found some of the older checks from his escrow account by falling through his daughter's ceiling and putting his hand through a box labeled "Christmas lights." Based on these checks, Brown filed another "accounting" on March 20, 2012.  This accounting listed all the checks that Brown claimed were written out of the guardianship funds.  Included on that list of checks that Brown represented to the chancery court were expenditures of guardianship funds were the $300,000 check to Shackelford written on February 22, 2001, and the $250,000 check written to Shackelford on September 7, 2001. During the chancery court proceedings, Brown never filed a proper accounting for the guardianship.  The chancery court held him in contempt and determined that he had committed a fraud on the court with his earlier filings and representations.[6]

¶12.    On December 19, 2012, a Rankin County Grand Jury indicted Brown for two counts of embezzlement under Mississippi Code Section 97-11-25.  The "Introduction" to the indictment alleged that Brown was a duly licensed and practicing attorney at law, acting as McClinton's and/or the Guardianship's attorney.  It further alleged that "[w]hile acting as such attorney, and by virtue of his said office and employment, certain monies, the property of the said Guardianship, came to the hands and possession of Defendant MICHAEL J. BROWN, including, *but not limited to*, the sum of One Million Dollars ($1,000,000.00), which came into Defendant's possession on or about February 20, 2001." (Emphasis added.) The indictment alleged that Brown deposited the sum into his escrow account, instead of a

---

[6]*See also* **In re Guardianship of DeMon B. McClinton**, 157 So. 3d 862 (Miss. Ct. App. 2015) (affirming the chancery court judgment as to Brown); *see also* **Mississippi Bar v. Brown**, 118 So. 3d 545 (Miss. 2012) (disbarring Brown due to the guardianship issues).

9

guardianship account as he was legally obligated to do. Count I of the indictment alleged that Brown

> on or about the 22nd day of February, 2001, in Rankin County, Mississippi, and within the jurisdiction of this Court, did willfully, unlawfully and feloniously convert the sum of Three Hundred Thousand Dollars ($300,000.00), the property of the aforesaid Guardianship, to his own use and to the use of one Linus Shackleford [sic] by delivering a check in the aforesaid amount drawn on the aforesaid escrow account to Linus Shackleford [sic], a copy of said check being attached as Exhibit "A" hereto, which said check was thereafter negotiated by Linus Shackleford [sic], and Defendant Brown thereafter did not turn over said money according to his legal obligation so to do, thereby embezzling same, and being in violation of §97-11-25 (1972, as amended)[.]

Count II made the exact same allegations, except that it covered the $250,000 check to Shackelford, converted on or about the seventh day of September, 2001.

¶13. Trial on the matter originally was scheduled for January 22, 2013, but was later continued to August 2013. On January 8, 2013, the State filed a "Notice of Intent to Offer [Rule] 404(b) Evidence." The State gave notice that it intended to offer all evidence "which proves or tends to prove motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake on the part of defendant with respect to the crime charged herein as the same may become relevant and admissible pursuant to the provisions of Rule 404(b), Mississippi Rules of Evidence." Brown did not respond or object to this notice offered by the State.

¶14. At the pretrial hearing in August 2013, Brown elected to represent himself at trial, while retaining attorney Clayton Lockhart to act as "standby," primarily to file motions for Brown and to conduct the direct examination of Brown himself during the trial. Trial began

10

on August 26, 2013. At the beginning of trial, Brown stipulated that he was "a duly licensed and practicing attorney in good standing" and "was acting as such in connection with the matters set forth in the indictment herein."

¶15. DeMon McClinton was first to testify. At the outset of his testimony, he mentioned luxury cars and a house that the guardianship had provided him. Brown did not object to this testimony. DeMon testified that, after he graduated from college, he and his father confronted Brown about missing money and forged signatures. He stated that he and Thomas threatened to report Brown to the bar, and that Brown admitted to taking money from the guardianship and that he begged them not to report him, promised to repay them, and issued them a promissory note.[7] DeMon also testified that, from the $1.2 million Brown controlled, his father received luxury cars, and that Linus Shackelford received two loans totaling $550,000, and that he did not hear of Shackelford receiving anything else. DeMon testified that it was his understanding that Brown facilitated the entire loan to Shackelford, stating that

> it was he came to you about business with that cemetery and basically took it upon yourself, you came into a client that you knew who had some money to – to fund that and you took it upon yourself to take their money because you had control of it and you did.

He also admitted on cross-examination that an accounting was completed and signed off by him and by Judge Robinson in 2006 when the guardianship was closed.

---

[7] With his questioning, Brown appears to admit that in 2007 he issued DeMon and Thomas a promissory note to cover the money lent to Shackelford.

11

¶16. Next to testify was Judge Thomas. Judge Thomas testified that in February of 2012, he found that Brown had perpetrated a fraud on the Hinds County Chancery Court with regard to DeMon's guardianship. Judge Thomas also testified, without objection from Brown, that Brown "placed most of this money in his escrow account and wrote checks to himself, to the ward's father, and purchased cars with the money and never properly accounted for the funds to the Hinds County Chancery Court . . . ." He noted that Brown never paid the guardianship back nor made a proper accounting to the chancery court. He did admit that Judge Robinson approved the prior accountings, but stated that the accountings were inadequate. He also noted that the guardianship court file had been missing for years, and that Brown had it in his possession. Additionally, Judge Thomas cited the law regarding guardianships and testified that Brown had violated the law with his actions.

¶17. Paul Rogers, the special master appointed in the chancery court case on the guardianship, testified next as an expert for the State. Rogers testified that, of the money that DeMon inherited, $1,290,493.08 was delivered directly to Brown. During Rogers's testimony, the State introduced a copy of the $1,000,000 check that was disbursed to DeMon's guardianship from Rebecca's estate. Brown objected on the grounds that there was "no proof" that the check was ever deposited. The State also introduced the $205,020.81 check intended for DeMon's guardianship that was deposited into Brown's escrow account, as well as additional checks in smaller monetary amounts. Rogers testified that "every lawyer has to have an escrow account and that's where you put other people's money and that is where [the checks] went. They went into Michael J. Brown's lawyer attorney-client or

escrow account, whatever you call it, not a guardianship account." Rogers further testified that expending guardianship funds without court approval violates the law and that no court order was obtained for the expenditure of any of the funds that made their way into Brown's escrow account. Rogers summarized the checks that Brown presented to the chancery court that he wrote off of his escrow account relating to DeMon's guardianship funds. Included in those checks were the two checks to Shackelford. He testified that Brown never repaid the guardianship funds he spent. In regard to the $1 million dollar check, Rogers testified that it was issued from the Rebecca Henry Estate, that the estate's attorney was very thorough, and that the estate reflected that the check was reconciled before the estate was closed. Brown attempted to argue that Rogers had no evidence that the $1 million check was ever deposited, and further that Rogers had no idea whether the $1 million dollar check was actually in Brown's escrow account when he wrote the $300,000 check to Shackelford. Rogers admitted that Judge Robinson had closed the guardianship, even after Russell had filed a petition questioning the $300,000 check.

¶18. Thomas McClinton then testified. Thomas testified that the guardianship money ended up in two accounts – the true guardianship account, and Brown's attorney trust account. He also testified that both he and Brown signed the $1 million check and that he did not know what happened to that check. Thomas also claimed that his name was forged on the $205,000 and $32,000 checks deposited into Brown's escrow account. Thomas represented that he and DeMon had confronted Brown about the forgeries and that Brown admitted that he took the money and begged them not to turn him in. Thomas also claimed

13

that he knew nothing about the loans to Shackelford until several years later, and at that time, the promissory notes were signed. Thomas then testified about the cars that Brown purchased with guardianship funds, including cars for Thomas and two of Thomas's fiance's children. Brown did not object to this testimony. Thomas testified that these cars, five in all, were titled to DBM, LLC, the nonexistent corporation purportedly representing DeMon. On cross-examination, Thomas testified in response to a direct question from Brown that he understood that Shackelford was borrowing money from the guardianship.[8] On cross-examination, Brown also took great pains to point out that the guardianship, and not Brown, was to be repaid the loans, and was thus the beneficiary of the promissory notes on the loans. Thomas, as did the witnesses before him, admitted that Judge Robinson had signed off on the final accountings when he closed the guardianship. During Brown's questioning regarding what Judge Robinson knew, he specifically questioned Thomas about "[a]ll the cars I had bought you guys," "[a]ll the money I had given you," and "[a]ll the property you had gotten."[9]

---

[8] Brown queried "It's your understanding that Shackelford was borrowing the money from the guardianship, correct?"

[9] Brown's questioning included the following: (1) "Isn't it fair to say that in reference to the cars that were bought for you, the Mercedes that were bought for you and Demon, that you found the Mercedes you wanted and called me and told me you wanted these cars; is that right?" (2) "do you remember calling me to buy a car for Lottie?" (3) "What about her sons, her children?" (4) "So you're saying that I – that all these cars and all this money I got, you had no – no knowledge of it, just out of the blue, I gave it to you; you never made any request for money; you never made any request for the cars; you never made any request for anything?" (5) "So when I gave you that check for $67,000 on September 7th, I just gave it to you?" (6) "So all the checks I wrote, the checks I wrote Lottie, you never had any knowledge about what I was doing?"

¶19. The State called Linus Shackelford next. Shackelford testified that in 2001, he was in the process of attempting to get a loan for $1.2 million for his business. Brown called him and informed him that he had a client who was going to receive some funds from the sale of a TV station and that he could loan Shackelford the funds. Shackelford first met Thomas when he and Brown were going to pick up some Mercedes Benzes. Shackelford, Brown, and Thomas had a meeting at Olive Garden, according to Shackelford. DeMon was not present, and Shackelford testified that he was unaware that the loans came from DeMon's guardianship funds until some time later. Shackelford further testified that Brown gave him both the $300,000 check and the $250,000 check in Rankin County. He testified that Brown informed him that the rest of the $1.2 million would come later. Shackelford also testified that he received the checks after signing the promissory notes.

¶20. Shackelford then testified that, around 2012, during the chancery court proceedings, Brown came to his office nervous and fidgeting and wanting to talk to Shackelford about the chancery court issues. It was a Wednesday night, and Shackelford had to attend church, so the two men set up a second meeting a day or two after. At that second meeting, Shackelford testified that Brown wanted him to say that he had borrowed more than $1 million and asked Shackelford to backdate some papers saying just that. Shackelford recorded that conversation, and that recording and a transcript thereof were entered into evidence. The recording contains the following:

> MR. BROWN: He's trying – okay. You're going to – I want to say I loaned
> you all that money.
> MR. SHACKELFORD: Say that again.

15

MR. BROWN: Instead of me giving the money to Thomas, I'm going to say I gave the money to you, you got a promissory note. They're not planing on you coming in with a promissory note saying you got the money, okay. What that does is – in your defense is, "Yeah, I borrowed the money. I tried to contact Thomas several times to see if we could work out some kind of payment thing and he" – "the last conversation he had with me he said he'd get back with me, and that's been six years ago" or whatever it is. The statute of limitations has run on it, okay. It's not your responsibility to pay somebody back. You understand what I'm saying? Okay. It's not – you know, in fact, at the time you contacted him, you might have sold the business and got out of the business if it had not worked out with him on that aspect of it. Do you see what I'm trying to get you to understand?

MR. SHACKELFORD: Yeah. I hear what you said, Mike. I just keep thinking about me. I'm not telling the truth if I say that, and that's the only thing that's really got me. And why – why do you want me to sign a deed of trust now.

MR. BROWN: It's not a deed of trust. It's a promissory note. The same thing you already did.

MR. SHACKELFORD: Well, why do you want me to sign them now?

MR. BROWN: Because I've got to have them to show you the money.

MR. SHACKELFORD: Well, what about the ones I already signed?

MR. BROWN: Those are [sic] well. Those will still be applicable. You're not signing them as of this date. You're signing them back as of 2000 –

MR. SHACKELFORD: But I already signed them.

MR. BROWN: Not the big one.

MR. SHACKELFORD: Oh, you want me to sign one for the whole thing?

MR. BROWN: No. No. No. No. They're gonna be – you'll get one – one will be spaced back and then one will be after, something like that. But it's gonna be – it's not going to – it's already gonna be expired.

MR. SHACKELFORD: All right, Mike. Let me ask you this – and another thing that I just can't get off my mind. Do you want me to say this to a judge?

MR. BROWN: Right.

MR. SHACKELFORD: And if I – if I would do something like that – and I asked you this before – and then the truth comes out –

MR. BROWN: How is the truth gonna come out? You're gonna sign the promissory note. All they're gonna see –

MR. SHACKELFORD: Well, I didn't get the money, though. And, you know, I don't know what they asked for about accounting. I still don't understand exactly what they're referring to when they say they want to see accounting. So if accounting refers to my books and they go back and check this, they're gonna see where I never got that money.

MR. BROWN: That's not true. That's not true.

16

MR. SHACKELFORD: Why is it not true?

MR. BROWN: Because they don't know where you got all your other money. You had so much other money coming, there's no way they're gonna know that.

MR. SHACKELFORD: It's all – the CPA's got it all wrote down.

MR. BROWN: Okay. Okay. Okay. You don't have any business records that go back that far anyways.

MR. SHACKELFORD: My business records go all the way back to '99.

MR. BROWN: They don't know that.

¶21. Brown further appeared to admit that he had loaned Shackelford guardianship money.

MR. BROWN: You know what I was doing was – the way I was doing it was – Robinson didn't care if you paid any interest. Okay. The interest you were gonna pay –

MR. SHACKELFORD: Who's Robinson?

MR. BROWN: The judge. Okay. He wanted to make sure this is a secured investment, and this is about as secure as you can be. It's still a secure investment. It ain't your fault. It ain't my fault Thomas didn't do what he should have done to collect the money.

MR. SHACKELFORD: Well, really, what really made it bad was, you know, I needed 1.2 million with 25-year amortization, and when we talked and you came to me and offered that to me instead of me getting it from the bank, then, you know, you had said that I was going to be able to get more, but not at that time. And then more never came, and it just – and then when I had that problem with that dad gum contractor out here – and that hurt, you know. It just – I've been beg, borrowing, and stealing ever since.

MR. BROWN: I understand that. I understand that. But if you do the way I'm talking about doing, you're never gonna be obligated to pay Tom back.

Brown again appeared to admit that this was guardianship money at a later point.

MR. BROWN: Okay. Let's just put it this way. When we originally did this whole thing, the whole deal. Thomas was gonna work with you in every way.

MR. SHACKELFORD: Yeah.

MR. BROWN: Okay. Listen to me a second. Okay. I'm in trouble right now because I helped him and I helped you. Okay.

MR. SHACKELFORD: I don't think it's fair for him to get off the hook.

MR. BROWN: I didn't have to do anything for either one of you. I could have just sat there and got about half a million dollars in fees for all the work I done.

MR. SHACKELFORD: That's what you should've done.

MR. BROWN: In the end – well, I would have done that except I knew – I trusted Thomas, I trusted you. And the whole thing of it is is I look at the problem you're having is if Thomas had done what I asked him to do with you numerous times, you wouldn't be in the boat you are.

Brown continued with his attempts to defraud the chancery court and admissions that the

money was guardianship money:

MR. BROWN: But they would have made ten times their money. They would have made ten times the money. All I need now is I – when we bring these other promissory notes to bear, that's gonna blow them out of the water because, see, Thomas is gonna say, well, you bought these new vehicles. Demon's money didn't buy any of these vehicles. See, I had a bunch of money coming to me –
MR. SHACKELFORD: Wait. I don't understand that. You said the money that bought the vehicles. That difference of that million and what I got bought the vehicles.
MR. BROWN: Right. That's what bought all the vehicles and got Thomas some other land and some other stuff. It got him a bunch of cash.
MR. SHACKELFORD: But you're not gonna show that?
MR. BROWN: No. No. I'm gonna show that you got the money. See, Thomas can't sue you for that money. If he could, I would be able to protect you because of all the money he got. But I can't do that. All you do is sit there and say, "I borrowed this amount of money, yes. Why? It was a secured investment; gave Mr. Brown my appraisals; took them to the judge. It's my understanding the judge approved everything." And that's exactly what – the whole thing. The way I looked at it was this way. If you had gotten everything going, you would have had no problem paying us the interest because you would have had an up and going business.
MR. SHACKELFORD: Yeah. That's true, Mike.
MR. BROWN: I understand. You're preaching to the choir right now. I understand. I understand you, and I understand everything with Thomas. So if Thomas – you asked me why I didn't do it the other way. Well, looking back I wish I had. Everybody would've gotten screwed by me. Okay. But you wouldn't have got help. You would have lost everything.

Shackelford also specifically mentioned that he received $550,000 in loans from Thomas.

Brown compounded the requests for Shackelford to assist him in defrauding the chancery

court, and further appeared to admit to defrauding the chancery court when the estate was

closed:

> MR. BROWN: If you do this, they can't come back on you. Let's just put it this way. Let's just go this route.
> MR. SHACKELFORD: You know, it's bad enough that I borrowed $550,000, and now you're wanting me to say I borrowed a million.
> MR. BROWN: It's even more than that.
> MR. SHACKELFORD: What?
> MR. BROWN: It's a million two is what it comes down to. I think that's how much I gave him.
> MR. SHACKELFORD: You gave him about 550,000 too or $650,000?
> MR. BROWN: Uh-huh.
> . . .
> MR. SHACKELFORD: Thomas got $650,000?
> MR. BROWN: Roughly somewhere in that range. I wrote him a check for 80-. I forget all the stuff I wrote for him.
> MR. SHACKELFORD: No wonder he don't want to get exposed.
> MR. BROWN: It's not about being exposed. I just shouldn't have done what I did and bought –
> MR. SHACKELFORD: Does the judge know he got that money?
> MR. BROWN: No. All the judge knows is he bought – I think the judge thinks he bought a bunch of cars.
> . . .
> MR. BROWN: It doesn't make any difference. The money's irrelevant. This is how it all works up. When you come in and you testify this is how much money I borrowed, and that's all you have to say. "Yes, I borrowed it. I borrowed it ten years ago." Okay. "Why did you borrow it? I borrowed it to do my business out there." And when the money was ready – "And I had to pay it back, I contacted Thomas." I said, "Look, I can't pay it this way, but I could sell the business or we can work some kind of deal out. And over a period of years, he would never work with me on anything, and, finally, I just said, look –
> MR. SHACKELFORD: Well, that part is true.
> MR. BROWN: Let's just put it this way. All the years that I did stuff for you legally, how much have you paid me?
> MR. SHACKELFORD: Oh, good gracious, Mike. I don't know.
> MR. BROWN: Nothing.
> MR. SHACKELFORD: No, I've give you $5,000 that time we was coming back from – you remember that time we was coming back up Highway 49. I've paid you. I give you $5,000. I give you $5,000 twice.

MR. BROWN: Once. I remember that.

MR. SHACKELFORD: But I have it – no. You probably done a whole lot more for me than what I paid you for.

MR. BROWN: Okay. Okay. So you can look at it is that's – the money that you're claiming is messed up is money that was owed to me through legal fees.

MR. SHACKELFORD: $650,000?

MR. BROWN: No. No. No. No. No. No. See, Thomas couldn't come back on you on that anyway because the thing of it is, if he sued you – if he legally – even if he legally could sue you, you would get credit for the monies he got paid. The judge – okay. I can't tell – if I did the full-fledge accounting, the judge would be on me to the wall because he'd say why did you do this. Well, I helped Thomas out and I helped Linus out. Well, legally, you weren't able to do that, and I'd say you're right and I knew better. And the judge would look at me and say that's kinda stupid on your part. If you could have gotten paid, you wouldn't be in this predicament right now, and I'd say, yeah, you're right.

Brown further begged for Shackelford to help him defraud the chancery court:

MR. BROWN: If you do this for me, you and I are friends for life.

MR. SHACKELFORD: Well, I mean, Mike, we've been friends for a long time anyway. I mean, what the heck?

MR. BROWN: You just need to – this is your redemption from me, and, like I said, you're bailing me out, okay. Like I said, I shouldn't have done what I did here.

Brown then flatly admitted to defrauding the chancery court with the accountings done when the estate was closed, and further flatly admitted that the money loaned to Shackelford was guardianship money:

MR. BROWN: . . . See, when I did the accounting, I put in there about the real estate. You have this amount of money. So they sign – Dewayne and – I mean, Thomas and Demon signed off on it. Their lawyer signed off on it.

MR. SHACKELFORD: (Inaudible) or the whole thing?

MR. BROWN: The whole thing.

MR. SHACKELFORD: So the judge thought I got all that?

MR. BROWN: Right. Because, see, I included the interest. That's how I was able to do it. Okay. And so the whole thing of it is is they're now – see, you have this already done. Robinson approved it. So when we come in now and I say, look, here's all the promissory notes that Linus got and they add up to

20

the monies I had control over, okay. Thomas knew about all that. The Court knew about them. Okay. The court approved them. Thomas never tried to collect the money or take the proper steps to collect the money. It would be no different if you had a CD. You just do it in the water. It would be a noncollectable debt. Okay. You[r] out is, look, at the time I was trying to work with Thomas I could have sold the business, made more money, got out, and saved my health. Because this was all hanging over my head, I never did it until – I'd look at Thomas and said, Look, you didn't – you were supposed to get back to me and you never did and now my understanding is the statute of limitations has expired.

MR. SHACKELFORD: And you're sure about that?

MR. BROWN: Yeah. There's no question about that one.

MR. SHACKELFORD: There's nothing that can stop them?

MR. BROWN: No. No. Unless they can claim it was done under fraud. That we fraudulently – that Thomas did not know about the money.

MR. SHACKELFORD: Well, Thomas knew about that dad gum loan. That day we went and had that lunch, I wanted to meet him before we did it. We went and picked up his car at whatever you call that place.

MR. BROWN: . . . But the thing of it is is, when I come into court – and you're not gonna be there – and I show all these promissory notes, okay. One is – their argument is gonna be, well, what about the cars? Well, what about the cars? That has nothing to do with Demon's money. It has nothing to do with Demon's money. *This is Demon's money right here, and I can show Demon's money.*

(Emphasis added.)

¶22. On cross-examination, Brown tried to elicit testimony from Shackelford that when interest on the loans was calculated, Shackelford owed DeMon more than one million dollars. However, Brown acknowledged that Shackelford did not actually *receive* more than one million dollars in guardianship funds, noting that "The checks that I could find on how much *I* had given you was 585, wasn't it?" (Emphasis added.) He also elicited testimony from Shackelford that the $300,000 loan he received was from DeMon's guardianship. Brown also engaged in the following questioning:

Q. Who do you owe the money back to?

21

A. Mr. Brown, I just answered that. I owe the money to Demon McClinton.

Q. You borrowed the money from Demon and you owe the money to Demon. There's never been any question about that, is there?

A. Not after I found out exactly what was going on, no.

Q. You never intended – I never asked you to pay me back for any money, did I?

A. No.

Q. Because you didn't borrow any money from me, did you?

A. The money came through you so I don't know how to answer that. The money came through you. You're the one that offered me the money and you loaned me the money. Now where the money came from, I was under the impression it was from Thomas through you.

Shackelford testified that Brown had made the arrangements for Shackelford to receive the loans.

¶23. Next to testify for the State was Judge Robinson. Judge Robinson testified that he never had signed an order granting permission for any guardianship funds to be loaned. In fact, he testified that he had never, in twenty-four years as a chancellor, signed any order for any guardianship authorizing someone to lend guardianship funds. He also testified that he had never given oral permission to lend DeMon's guardianship funds and that Brown had never presented him with any request for permission to lend money to anyone. Judge Robinson further testified that if he had known that Brown had lent several hundred thousand dollars of DeMon's funds, he "would have probably called the DA." While Judge Robinson did not specifically remember the closing of DeMon's guardianship, he did testify that he would have satisfied himself that the accounting was proper, as was his normal procedure. However, on redirect, he testified that he would not know about accounting irregularities if a fraud was perpetrated on the court.

¶24. After Judge Robinson's testimony, the State rested. Brown moved to dismiss, and argued that he did not benefit from the funds and that the State did not offer any proof of the actual fact of the $1 million check being deposited. He also argued that, if there was any transaction that an embezzlement charge could be based on, it would be the depositing of the $1 million check in Hinds County, not the distribution of the two checks to Shackelford. He further argued that there was no evidence to show that the funds from the $250,000 and $300,000 checks came from the $1 million check. He emphasized his belief that the State had offered no proof that the $1 million check was ever deposited anywhere. He continued "that there's no proof that the check was ever deposited, that there's no proof about these other checks in regards to that they should be the indelible checks, there's no money shown on State Exhibit 1 that shows this money came out of escrow of that money for the ward from Tom Ross. I don't think the State's met its burden." He also argued that the State was required to bring a bank executive to testify to "follow the money." The State argued that it had established a prima facie case through expert and circumstantial evidence. The court then denied Brown's motion.

¶25. The defense began its case-in-chief by calling Brown as a witness, to be questioned by his co-counsel. Brown testified that he and Thomas had deposited the $1 million check at Trustmark in Jackson around February 26, 2001, and that the bank told him they would be putting a hold on the money for several days. He then testified that prior to the $300,000 promissory note being signed, he "had taken the appraisals in to see Judge Robinson. I had a conversation with Judge Robinson about this matter and got approval from Judge Robinson

23

on this matter and that was – was what was done." He then testified that the $1 million did not come to DeMon as quickly as he thought, so

> I wrote a check, after I got notification from Mr. Ross that the money was coming in, I had in that bank account at that time, I think I had about $600,000, or 700, maybe a little – a little over $600,000 of my money in that bank account. I wrote a check for Shackelford, I want to say it was on the 22nd. It was either the 21st or the 22nd and – . . . And the original $300,000 was not from this million dollars. The original $300,000 was my money and that's why I said it's the first case I've ever been involved in that bank statements aren't used to prove an embezzlement. The million dollars came to me at the end of February – . . . The million dollars came to me after I wrote the check to Shackelford and he endorsed it, and it came out of my funds.

¶26. Brown introduced into evidence two pages of what he testified was his escrow account ledger book, in which he kept a personal record of checks written. Brown claims that the first page showed that on February 21, 2001, his balance was $560,123.37, and that he wrote Shackelford the $300,000 check on February 22; then at the end of the day on the 22nd, his balance was $258,119.09. The exhibit shows only three checks and does not reflect any deposits. Brown claims that the second page shows that he made a deposit of $378,000 on September 7, 2001, and had a balance forward of $327.57. It also shows the $250,000 check written to Shackelford on September 7, 2001, and shows that at the end of the day, Brown's balance was $65,461.53.

¶27. Brown then testified that the $250,000 loan to Shackelford was his money, not guardianship money. He claimed that

> [i]t was strictly money from me and I was giving it to Thomas McClinton, because we had discussed things – of him doing stuff, including renovating a bunch of properties he was buying from Lottie Campbell, doing other – other investments and that. And so what I did is, instead of putting – if – if you look on the promissory note – . . . on the promissory note that was marked State's

24

Exhibit 13, that promissory note was for the guardianship of Demon McClinton.

He then claimed that the $300,000 check was a loan from DBM, LLC

> and that is where the loan was from.  The loan was not from the guardianship.  The loan was from a company that Thomas was going to run on the benefit of Demon. It had nothing to do with guardianship money.  This was strictly money.  That's why the DBM, LLC, is on – on that check.

He asserted that the $300,000 check was written off of his own personal funds, after he had received verification from Tom Ross that the $1 million check was on the way, because the original understanding was that the $300,000 was going to come out of guardianship funds.

¶28.    Brown introduced into evidence a bank statement from July 2001.  He testified that the ending balance was $3896.53.  He testified that the significance is that the $250,000 check from September could not come out of the $1 million check because the July balance was so low, the million dollars was not there.

¶29.    Brown then testified about the closing of the guardianship.  He testified that Judge Robinson "gave approval on the $300,000; although, it was never guardianship money, it was my money, but he gave approval on it."  He also testified that Russell, DeMon, and Thomas all accepted the accountings submitted in the closing of the guardianship, along with Judge Robinson.  He further admitted that DBM, LLC was DeMon.  However, he again testified that the money used to loan the $300,000 was his own money, not the guardianship's money, and that's why the check said loan from "DBM, LLC," even though Brown claims the loan was from him and not from DBM, LLC, the nonexistent company.  He also testified that the

25

money given to Thomas to purchase properties from Lottie Campbell came from his own funds.

¶30.   On cross-examination, Brown admitted that he had not returned the money to the guardianship as ordered by Judge Thomas.  After again testifying that the $300,000 and $250,000 checks at issue were his money, not guardianship money, Brown then testified that he

> gave the guardianship credit for money I gave them. . . . The checks I found, before March 20th, were the checks– I was able to do that and able to come up with the amount of money.  It didn't mean that that was money that was not my money.  It was just money I was given credit . . . .

¶31. He further testified that

> I knew on February 1, if I could find my checks and my bank statements, that I could show that I had given the guardianship more money than I had – than I had deposited from them, because I already knew I had the $300,000 and the $250,000 and another additional $140,000 that I had given to the guardianship without any question. . . . I told the court this is the money I'm getting credit to the guardianship, and that's exactly what I did.  I gave the guardianship credit.  All you've got to do is look at the bank records.  You know the money was from my accounts.

¶32.   Brown also testified regarding the accounting he filed with Judge Thomas that stated that $1 million of the guardianship funds were in promissory notes to Shackelford.  When asked if it were true that there were not $1 million in promissory notes, Brown responded "Well, that's the interest and everything calculated in there."  However, he admitted that Shackelford never *received* one million dollars, but rather received over $500,000 dollars.  However, he again tried to explain that "he owed one point – when I calculated it out, I think the interest was like 1.2 or 1.3."

26

¶33. Brown attempted to explain his March 2012 accounting, in which he explicitly listed the $250,000 and $300,000 checks as coming from DeMon's guardianship. When asked if that showed that the money came from the guardianship, Brown responded "No. I have no earthly idea what you're thinking. I gave them credit. The bank statements shows the money. That's why you follow the trails of the bank statements. This is one I gave credit for them." He further argued the following:

> Q. . . . So all of these checks were applicable to the guardianship of Demon McClinton?
> A. Well, I mean, to give him cred – to give me credit for what money I had given him.
> Q. Were they applicable to the account of Demon McClinton? That's why you put them on here, right?
> A. Right.

Furthermore, in explaining why the promissory note indicated that Shackelford was to pay the guardianship back when Brown claimed the loan was made with his money, he claimed:

> Because I wanted Thomas McClinton to get the money back. I was giving the money so Thomas McClinton would have the money. The guardian – that promissory note would have been originally drafted with Judge Robinson knowing. That's why when you look at the order – the thing that Russ Russell filed, he specifically talks about this $300,000. It was made clear in Judge Robinson's chambers the day we closed the guardianship. I mean, you look at the document. The document clearly states that.
> What I'm telling you is this. I gave that money, check my bank records, I have that money, $300,000, on the second – it was on the 22nd, February 22nd. That document was dated February 11th, because we were thinking we were going to get the check from the estate and we didn't get it.

27

Later, Brown argued that the promissory note mandated that Shackelford repay the guardianship rather than Brown because Brown gave the money to the McClintons because, in his words, he was "gracious."[10]

¶34.   As an attempt to explain his behavior in the recorded conversation with Shackelford, Brown testified that he was simply attempting to get Shackelford to acknowledge that he owed interest on the loans.  Brown then testified that Shackelford *received* over a million dollars because he owed interest; so, Brown's contention was that, when you calculated and included the interest Shackelford owed on the original $550,000 in loans, Shackelford somehow "got" more than one million dollars.  Brown also appeared to contradict himself regarding the conversation with Shackelford, arguing first that, during the conversation, "I didn't have no promissory notes with me.  That's why I said in – when we were doing – when we were doing the conversation, never once did he ask me to pass over the promissory note that I have.  I didn't have any[,]" then stating that what he was doing was "asking him to sign a promissory note, which we have there, a promissory note telling him how much money he owes the McClintons, yeah."

¶35.   Brown then recalled Rogers to the stand to attempt to get him to admit that the $250,000 could not have come out of the $1 million deposit.  Rogers explained that

> I don't believe that I compared money to money.  I was looking at totals and I didn't say whether it was this money or this money.  The $250,000 came from the McClinton guardianship money you received and was included by you in your accounting for the 1,290,493.08. . . . And you know, I never really

---

[10]Brown stated: "I gave that money to them.  I – that was not an issue to me.  I – I have given a lot of money away, and I think most people in this courtroom know that."

28

accounted it to say, 'Well, this money went here.  This money went here.'  I was looking at the overall totals.

He further clarified that

again, when I did this work, I was trying to account for dollars.  I wasn't trying to do it day by day.  My objective was to find the money that had come from those guardianships and the – come out of there, to find it and to determine where it went and that's what I did.  I wasn't looking at – again, I wasn't doing a day by day of it.[11]

Rogers also testified that "a lawyer doesn't put their own money into an escrow or trust account."  He did admit, however, that no ethical or legal prohibition for an attorney to place his own funds in his escrow account exists.  Rogers testified as to his belief that Brown had "helped himself" to guardianship money, and was merely paying back the guardianship with his $398,000 legal fee that he allegedly used to loan Shackelford the $250,000 for money he had already spent, because he had commingled the funds.

¶36.    After Rogers's second round of testimony, the defense rested.  The parties then presented jury instructions.  Brown first objected to Instruction S-1A provided by the State.  S-1A is the elements instruction for the first count of embezzlement.  In pertinent part, that instruction provided that Brown

3. Came into the possession of the sum of One Million Dollars ($1,000,000.00), the property of the Guardianship of Demond [sic] B. McLinton [sic]; and
4. Instead of depositing said funds into a guardianship account as he was legally obligated to do, he deposited said funds into a bank account owned and controlled by the defendant and styled "Michael J. Brown, Attorney at Law, Escrow Account"; and

---

[11]Roger further stated: "I did not, as I previously said, I didn't do a day by day accounting for the money.  I was looking at the total money you received, the total money you were responsible for."

5. The said Michael J[.] Brown, on or about February 22, 2001, in Rankin County, Mississippi, did willfully, unlawfully and feloniously, convert to his own use and the use of Linus Shackelford, the property of the Guardianship of Demond [sic] B. McClinton, a minor;

6. By delivering a check drawn on Michael J. Brown's aforesaid escrow account in the amount of Three Hundred Thousand Dollars ($300,000.00) to Linus Shackelford, who negotiated and deposited said check[.]

S-2A states the same essential elements, but refers to the September 7, 2001, $250,000 check, and Brown made the same objection to it as to S-1A. Brown's objection to S-1A and S-2A primarily centered around the language in part 3:

> MR. BROWN: We object to it.
> THE COURT: On what basis?
> MR. BROWN: Well, I think that the instruction, the way it has, it says, "Came into possession of the sum of $1 million of property of the Guardian of Demon McClinton." The indictment is talking about two – two checks. The way this is styled it's almost like a slam dunk. I don't think – I don't think it accurately reflects what the law says it has to prove or anything like that.
> . . .
> MR. BROWN: I don't think it accurately reflects what the law states that how an instruction should be given in reference to embezzlement. I think our – our instruction is more applicable in reference to – especially in light of that case, the Boteler – the Boteler case, I think is more applicable. It's the jury instruction that says the State of Mississippi has the burden of proof to show Count I and Count II cause.
> THE COURT: What specifically is, you're looking at S1(a), what is your specific objection? Point me to a point. Point me to a part and tell me what your objection is.
> MR. BROWN: The way – the way they have worded this, they're going backwards from where the statute shows. I mean, if – if you look at it – the way we have it, it says, "The State is required to prove, beyond a reasonable doubt, that Michael J. Brown, did unlawfully convert to his own use any money or other valuables came in – in his hands or possession by virtue of his office or employment where Michael Brown did not turn over such money" --
> THE COURT: What are you reading from right now?
> MR. BROWN: This is that Defense instruction.
> THE COURT: No, I want you to point to S1(a) and show me what is incorrect?
> MR. BROWN: Well, I think the way they've got it. They've got –

30

THE COURT: That's not helping me none.

MR. BROWN: – they don't have statute – they don't have it the way the statute has the – it listed how the elements are supposed to be. In fact, they've got the – the thing on "the conversion to his own use" as the bottomless pit. It is prejudicial. They've got here "by virtue of his employment position as an attorney came into possession of the sum of one million dollars of the property of the guardianship of Demon McClinton, and instead of depositing funds into the guardianship." That – that's argumentative. I mean –

THE COURT: All right. Hang on just a second. The first part, the first paragraph there will be no objection to.

"Number (1) The Defendant, Michael J. Brown, was an attorney at law at all times herein." I believe that's a necessary element –

MR. BROWN: Right.

THE COURT: – under 25.

MR. BROWN: Right.

THE COURT: "By virtue of his employment position, as an attorney at law, came into possession of property of the guardianship of Demon McClinton." I believe that under the statute I believe it has to show that you came into possession.

MR. BROWN: Yeah, but I –

THE COURT: Hang on. Came into possession of property that was embezzled.

Now, you know, I don't believe that it is necessarily required that it show that they came into possession of a million dollars. However, it is alleged in the indictment. So there's some case law that says if allege it, you've got to prove it. So came into possession of the sum of $1 million, property of Demon McClinton, instead of depositing said funds in guardianship account, he was legally obligated to do, he deposited – deposited said funds into a bank account only controlled by Michael J. Brown, attorney at law, escrow account.

Do you have any disagreement with that part of the instruction?

MR. BROWN: Well, like I said, I think the way our instruction is, yes, I still – I have a disagreement on three because three then brings the element about jurisdiction, the one million.

THE COURT: Well, I don't think it's the possession of it. It's the conversion of it. And I'm familiar with the case law on embezzlement. Embezzlement can be brought either where the property was converted or where they was bound to turn over the property, and I assume that they're going under the fact that they're going to where the property was converted and not where you were bound to turn it over based upon the testimony from Linus Shackelford. Is that correct, State?

. . .

31

MR. BROWN: I guess my argument is, what I look at is, the way our instruction –

THE COURT: Anything else you want to say about this instruction, go ahead and tell me.

MR. BROWN: I don't like part three.

THE COURT: Any other part?

MR. BROWN: I just don't like the way the language is on six and five, but I can understand where the Court's going. I'd just say our instructions seems to be more right – right in line with the statute.

. . .

THE COURT: The only thing that I've got a problem – concern about is, I don't necessarily believe he had to show that he came into possession of a million dollars. Is it in here because it's in the indictment?

. . .

MR. BROWN: Well, what – what's wrong with the Defense instruction that we read?

THE COURT: Well, the State has got the burden of proof and if they can have the elements instructions and it's a proper statement of the law, then I think they're entitled to their version of the instruction. I don't believe that's a necessary element unless, and I know that there's some case law that says that if you allege it, you've got to prove it; and it is alleged in the indictment. So without anything further, I'm going to overrule the objection and S1(a) will be given.

MR. BROWN: Are we going to do part three the same?

THE COURT: I'm sorry?

MR. BROWN: Are we going to change the language in part three?

THE COURT: You know, I think that tracks the indictment so I'm going to leave it there.

The State also submitted S-4, which stated "that it is immaterial to the defendant's guilt or innocence whether he used guardianship funds for his own personal use or for the use of another, so long as he directed and controlled the disposition of funds." Brown objected on the basis that the statute "clearly states that you have to show personal use or use another."

¶37. After jury instructions, closing arguments began. In his closing argument, Brown argued that the $1 million check was deposited in his account in late February or early March and that the funds were not available until approximately ten days later, the significance

32

being that the $300,000 check to Shackelford could not have come out of the $1 million deposit.[12] He further argued that the State's case could not be based on speculation, but must be based on "Absolute proof. You have to show a date certain this check was deposited, a date certain." His argument for the $250,000 check was that the $1 million check was deposited in February or March 2001, in July 2001 he had a bank balance of $4,000, and he wrote the $250,000 check in September 2001, thus the $250,000 could not have come out of the $1 million, and it instead came out of the $398,000 fee he received from the guardianship and allegedly deposited into the escrow account. He further argued that Judge Robinson's closing of the estate "exonerates everything." He also maintained that he "gave money that was mine to the detriment of my wife. I gave money away. And you saw that. The documents prove that." He did seem to admit that he had control of a certain portion of the guardianship money, stating "We just heard that I'm – that Demon McClinton's broke. He had $4.2 million, somewhere in that effect, and I had control of 1.2, bought cars, houses for him, loans to Shackelford. Where did the $3 million go? I had nothing to do with that. I had 1.2." Brown further seemed to argue, contradictorily, that there was no proof that the $1 million check was "ever" negotiated, posing the question "Where's the proof that this was ever date certain this was negotiated?" Wrapping up his closing argument, he told the jury to "Remember, there's never any proof that I benefited [sic] from anything. There was never any proof that the guardian was out any money that I was entrusted to. He got goods and he

---

[12]Brown also argued in closing that "If I had not fallen through my daughter's ceiling and put my hand through that box and found those checks, I would be crucified. Like I've told my wife many times on the phone, I know how Jesus feels, or felt. And that's exactly right."

33

got stuff for himself and his dad." He further concluded, again, that the State had to prove a "date certain" on which the $1 million check was negotiated.

¶38. The jury found Brown guilty on both charges. At sentencing, the court asked the State to address the issue of restitution. The State responded that

> if we could leave that matter open for 30 days, we have been in touch with the victim in this case, Demon McClinton. He's unable to be present today.
> There has been – the Chancery Court in Hinds County has ordered Mr. Brown to pay back over $1.2 million. As far as I know, none of that has been paid yet. But I believe in this case we have shown that 550,000 was taken from the guardianship funds of Demon McClinton and embezzled by Mike Brown, so we would ask that a minimum of 550,000 be ordered to be paid in restitution to the victim in this matter.

Brown did not object, but did note for the court that Shackelford had testified that he had made over $100,000 in payments to DeMon. The court ultimately sentenced Brown to twenty years on each count of embezzlement to run consecutively, with the last ten years of the second sentence suspended. The court then ruled that:

> Specific conditions of which will be that you pay restitution in the amount of $1.2 million to Demon McClinton;
> And I'll order that you begin paying at a rate of not less than $300 a month, beginning on the last working day of the first full calendar month after your release from incarceration and continuing from month to month thereafter until paid in full.
> You'll get credit for any payments that are made either by Mr. Thomas McClinton, or payments that are made by Linus Shackelford relative to this $1.2 million.

The judgment of the court, signed on September 6, 2013, and filed on September 9, 2013, memorialized the restitution ordered.

34

¶39. Brown filed a motion for judgment notwithstanding the verdict (JNOV) and a new trial on September 6, 2013, arguing (1) the verdict was against the overwhelming weight of the evidence and contrary to the law; (2) that the *jury*

> impermissibly shifted the burden of proof to the Defendant, Michael J. Brown, by requiring that he prove that he received and deposited a check in the amount of One Million Dollars ($1,000,000.00) which was meant to be guardianship funds and which should have been placed in a restrictive account. This shift of the burden of proof by the jury worked to violate the Defendant's Constitutional rights against testifying which are guaranteed under the 5th Amendment. 6th Amendment, 14th Amendment of the U.S. Constitution, and Art. 3, § 26 of the Mississippi Constitution;

(3) that the verdict in Count II was against the overwhelming weight of the evidence because the evidence shows that the $250,000 check came from funds that belonged to Brown; and (4) the court erred in overruling Brown's motion for a directed verdict. The motion was heard on November 4, 2013, with Brown arguing that there was no proof that the $1 million check had been deposited when he wrote the $300,000 check and that the $250,000 clearly did not come out of the $1 million check, but from the $398,000 check. He also argued that "for personal use" means for a person's own personal use or personal gain. He maintained that the act of conversion was the act of depositing the $1 million check into his account, not the loans to Shackelford, which would lead to a one-count indictment with Hinds County having jurisdiction, not Rankin County. The trial court denied the motion for JNOV. On December 6, 2013, Brown filed a notice of appeal.[13]

---

[13]Brown also filed a Motion to Set Aside Judgment of Conviction and Dismiss Cause of Action or in Alternative Motion for New Trial Based on New Evidence Found, which is in the appellate record. Brown allegedly attached the "new evidence" to his Motion as "Exhibit A." Exhibit A is not in the appellate record, nor does it appear to actually have been attached to the motion as presented to the trial court. However, Brown represented that

¶40. Brown appealed, arguing 1) the denial of the motion for JNOV must be reversed because the evidence was insufficient because of lack of forensic proof that Brown used the guardianship money for the loans, lack of proof that the conversion of funds benefitted Brown or was for his use or was specifically intended for his own use, and further, that the verdict was contrary to the great weight of the evidence; 2) Brown was irreparably prejudiced by irrelevant evidence of other bad acts; 3) Brown was prejudiced by inaccurate jury instructions; and 4) the restitution portion of Brown's sentence is illegal. Brown requests that this Court reverse and render his conviction, or, in the alternative, reverse and remand for a new trial, or, in the alternative, remand for resentencing.

**ANALYSIS**

*1. Insufficient Evidence/Weight of the Evidence*

¶41. "[W]hether the evidence is sufficient to sustain a conviction in the face of a motion for directed verdict or for judgment notwithstanding the verdict, the critical inquiry is whether the evidence shows 'beyond a reasonable doubt that the accused committed the act charged, and that he did so under such circumstances that every element of the offense

---

based on Exhibit #A the document shows that the $1,000,000.00 dollar check was deposited and cleared on February 21, 2001 and that the first check written to Linus Shackelford was deposited on February 23, 2001 and that the second check written to Linus Shackelford was deposited on September 7, 2001 and therefore the checks were written after the $1,000,000.00 check had cleared the bank.

He argues that this means that the only charge should have been on the $1,000,000.00 deposit, and thus Rankin County would not have jurisdiction. The trial court denied the motion because a notice of appeal already had been filed, and thus the trial court found that it no longer had jurisdiction over the case.

existed; and where the evidence fails to meet this test it is insufficient to support a conviction.'" ***Bush v. State***, 895 So. 2d 836, 843 (Miss. 2005). "[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." ***Id.*** (quoting ***Jackson v. Virginia***, 443 U.S. 307, 315, 99 S. Ct. 2781, 2783, 61 L.Ed. 2d 650 (1979)). This Court must reverse and render when the facts and inference point in the defendant's favor on any element "with sufficient force that reasonable men could not have found beyond a reasonable doubt that the defendant was guilty." ***Bush***, 895 So. 2d at 843 (internal quotations omitted). But when the evidence is of "such quality and weight that, 'having in mind the beyond a reasonable doubt burden of proof standard, reasonable fair-minded men in the exercise of impartial judgment might reach different conclusions on every element of the offense,' the evidence will be deemed to have been sufficient." ***Id.*** (quoting ***Edwards v. State***, 469 So. 2d 68, 70 (Miss. 1985)). However, to some extent, Brown raises a legal question in interpreting the "own use" element of the offense, thus, to that extent, this Court reviews the judgment of the trial court de novo. ***Jones v. State***, 158 So. 3d 1144, 1145 (Miss. 2015).

¶42.     When this Court reviews a denial of a motion for new trial "based on an objection to the weight of the evidence, [it] will only disturb a verdict when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice." ***Bush***, 895 So. 2d at 844. The evidence is weighed in the light most favorable to the verdict, and the Court sits as the "thirteenth juror." ***Id.***

37

¶43. The statute under which Brown was convicted states in pertinent part:

> If . . . any attorney at law . . . undertaking to act for others and intrusted by them with business of any kind, or with money, shall unlawfully convert to his own use any money . . . which comes to his hands or possession by virtue of his office or employment, or shall not, when lawfully required to turn over such money . . . , immediately do so according to his legal obligation, he shall, on conviction, be committed to the department of corrections for not more than twenty (20) years . . . .

Miss. Code Ann. § 97-11-25 (Rev. 2014). Brown attacks the sufficiency of the evidence for two primary reasons: first, he argues that the State failed to prove that Brown used guardianship funds to make the loans, and second, he argues that the State failed to prove that he converted the funds to his own use. In essence, Brown argues that he acted ineptly, and perhaps committed malpractice by failing to seek chancery court approval for the loans, but that he did not commit a crime.

> a. *Whether Sufficient Evidence Existed Showing that Brown Used Guardianship Funds to Make the Loans*.

¶44. Brown claims that the State's evidence on this issue "relied totally on the speculative opinions of the Honorable Paul Rogers who did not have complete records and did not produce any forensic proof that Brown used guardianship money to extend the loans to Shackelford. The best Rogers could offer was his guess as to what happened." Brown relies on *Sisk v. State*, in which this Court found insufficient evidence to support the element of conversion.[14] *Sisk v. State*, 294 So. 2d 472 (Miss. 1974). Sisk was indicted and convicted

---

[14]He also relies on *Salts v. State*, 984 So. 2d 1050 (Miss. Ct. App. 2008) for the argument that he did not have the specific intent to embezzle the property. *Salts* is inapposite, as the entire discussion regarding intent revolves around the phrase "fraudulently appropriate" in a different embezzlement statute than the one under which Brown was indicted. The statute under which Brown was indicted requires a defendant to "unlawfully

38

for embezzling machinery from the county. *Id.* The State's evidence showed that invoices for construction machinery, paid for by the county, listed among the several parts a few that did not fit any county machinery, but would fit machinery personally owned by Sisk. *Id.* at 473-74. The Court found that there was no evidence that the parts allegedly converted were actually ever attached to Sisk's machinery and noted that the evidence actually showed that Sisk reworked several of the parts listed in the indictment to use upon county machinery, and further showed that some of the parts were used in the construction of a winch for the county. *Id.* at 474. The evidence also showed that the invoices appeared "suggestive, we think, of clerical error in the shipment of parts unsuitable for the county's machines and surely, precarious evidence upon which to base a conviction." *Id.* at 474-75. Unlike in *Sisk*, in which no evidence showed that Sisk actually had converted the machinery to his own use or anyone else's but the county's, the evidence here shows that Brown possessed, controlled, and used guardianship funds for his own purposes.

¶45. The State put forth much more evidence than merely Rogers's opinion to show that the loans came from guardianship funds. First, the State placed into evidence the chancery court accountings in which *Brown himself* represented that the loans came from guardianship funds. Second, the $300,000 promissory note stated explicitly that the loan was made from the guardianship, and the $250,000 promissory note stated that the loan was made from Thomas. Third, the check written for the $300,000 loan stated that the check was a loan from "DBM, LLC," and testimony made clear that this was a nonexistent company that was meant

convert" money; it does not require fraudulent appropriation.

39

to be for the benefit of DeMon. Fourth, the testimony of Thomas, DeMon, and Shackelford established that the loans were from the guardianship. Fifth, on the audio recording of Brown and Shackelford's conversation, played and transcribed for the jury, Brown affirmatively stated that the loans came from guardianship money. Sixth, the State put forth evidence that the $1,000,000 check was written on February 20, 2001, and Brown began spending large and extravagant amounts of money on behalf of the guardianship on February 21, 2001. Seventh, Brown claimed numerous times that he had oral permission from Judge Robinson to lend the guardianship money, yet failed to explain why he would obtain such permission if he was actually loaning his own money. Eighth, Brown himself elicited testimony from Shackelford that the funds loaned were guardianship funds, premising his questions on that exact assumption.[15] Indeed, the only evidence of any substance that the loans did *not* come from guardianship funds was Brown's testimony and Brown's own handwritten check ledger. The jury, the ultimate judge of credibility, clearly found Brown's representations not credible. Brown's argument that the State must somehow "follow the money" and prove a day-by-day account of it to obtain an embezzlement conviction does not appear to be based in the statute. The statute provides that there must be a conversion of

---

[15]Q. Who do you owe the money back to?
A. Mr. Brown, I just answered that. I owe the money to Demon McClinton.
Q. You borrowed the money from Demon and you owe the money to Demon. There's never been any question about that, is there?
A. Not after I found out exactly what was going on, no.
Q. You never intended – I never asked you to pay me back for any money, did I?
A. No.
Q. Because you didn't borrow any money from me, did you?

money. So long as the State proved that the money converted was ultimately guardianship funds, such a day-by-day specific account of the money, while certainly helpful to the State's case, is not necessary.[16]

¶46. Given all of this evidence, and viewing it in the light most favorable to the prosecution, reasonable and fair-minded jurors considering the beyond a reasonable doubt standard certainly could have reached differing conclusions on this element. Thus, sufficient evidence exists showing that Brown converted guardianship funds, supporting the conviction.

   b. "Own use" Element

¶47. Brown argues that insufficient evidence exists to support that he converted the guardianship funds to his "own use." In part, this raises a legal question, because he argues that converting property to his "own use" must benefit Brown in order to constitute embezzlement. Brown argues that the loans, to be repaid to the guardianship at ten percent interest and secured by Shackelford's real property, benefitted the guardianship, not Brown. The State argues that, so long as Brown directed and controlled the disposition of the funds, such action satisfies the "own use" element.

¶48. In ***Boteler v. State***, this Court found that it was not a defense that the defendant claimed he used State funds simply to pay himself back for paying for State expenses out of his own funds. ***Boteler v. State***, 363 So. 2d 279, 282 (Miss. 1978). The Court cited a Kansas

---

[16]At several points at trial, Brown appears to have argued that he gave the guardianship "credit." To the extent he was arguing that he gave Shackelford the loans and then repaid himself out of guardianship funds, this does not appear to be a defense if the ultimate source of the loans was guardianship funds and the intent to convert occurred when the checks were delivered. It is unclear whether Brown attempts to raise that argument on appeal.

41

case in which a defendant argued that he used the embezzled funds for the benefit of the bank at which he was employed, not for his own personal use. *Id.* This Court cited the case for the proposition that

> "[t]he motive which prompted the embezzlement is not material. . . . The money was applied to the use of appellant, when he used it in the way he wanted to use it. Whether he chose to use it on his personal obligations, or give it to the bank of which he was president, or spend it in riotous living, he directed its disposition, and thereby applied it to his own use."

*Id.* at 282-83 (quoting *State v. Pratt*, 220 P. 505 (Kan. 1923)). This Court further noted that "[i]f the defendant could be acquitted of the charge of embezzlement on the defense offered in this case, any embezzler could be acquitted upon a simple showing that he did not retain the embezzled funds for his own use but gave them to another person." *Boteler*, 363 So. 2d at 283. The Court noted that the defendant directed the money's disposition and thereby applied it to his own use.[17] *Id.*

¶49. Brown attempts to distinguish this case and the underlying Kansas case cited by noting that "both cases involve a clear showing of a theft by the defendants followed by a cover up scheme." Brown claims this is distinguishable from his case "because Brown never first committed any theft and then tried to cover it up." With all due respect, the State has put forth evidence that Brown committed a theft by taking money belonging to the guardianship, and it played for the jury an audio recording in which Brown was very clearly trying to cover

---

[17]The State cites as persuasive authority *Morissette v. United States*, in which the Court found that conversion "may be consummated without any intent to keep and without any wrongful taking, where the initial possession by the converter was entirely lawful. Conversion may include misuse or abuse of property. It may reach use in an unauthorized manner or to an unauthorized extent of property placed in one's custody for limited use." *Morissette v. United State*, 342 U.S. 246, 272, 72 S. Ct. 240, 254, 96 L. Ed. 288 (1952).

it up. Brown is essentially arguing that his actions are not criminal because he ultimately intended for his embezzlement to benefit the guardianship from which he embezzled funds. Not only would Brown's theory allow a person to absolve oneself of embezzlement by giving the money to another person, a concern raised in **Boteler**, it would also allow a person to absolve himself of embezzlement by claiming that he embezzled the money only to ultimately benefit the victim. If an employee stole money from his employer and then invested it in an account bearing the employer's name, under Brown's theory, such behavior somehow negates the original embezzlement. Such is not the case. The original embezzlement deprives the victim of the right to *direct and control* his own property as the *owner*, not the embezzler, sees fit, even if the embezzlement ultimately turned a profit for the victim.

¶50. Sufficient evidence existed that Brown, rather than the court via court order, directed the disposition of the guardianship funds. It is clear that Brown deposited some guardianship funds into his escrow account, and that he never moved them from his escrow account to a guardianship account. The testimony of Thomas, DeMon, and Shackelford demonstrated that Brown was the originator of the idea to loan guardianship funds to Shackelford and that he had orchestrated and facilitated the entire transaction. The checks themselves show that Brown wrote the checks off of the guardianship funds from his own escrow account. Shackelford's testimony was that Brown, not anyone else, then delivered the loan checks to him. Indeed, Brown himself, on the audio recording of his conversation with Shackelford, indicated that he had control of and disposed of guardianship funds. Moreover, a court order

43

required court approval for any guardianship expenditures, a requirement that Brown clearly flouted, choosing instead to dispose of the funds himself. Even some of Brown's own questioning of witnesses at trial indicates that he directed and controlled the guardianship funds.[18]

¶51. The standard set in ***Boteler*** is the appropriate standard to follow. If Brown directed and controlled the disposition of the money, he applied it to his own use. Sufficient evidence exists to prove Brown directed and controlled the disposition of the checks at issue and thus applied the money to his own use.

### c. Weight of the Evidence

¶52. Based on the analysis above, it is clear that the verdict, when weighed in the light most favorable to the verdict, is not "so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice."

## 2. Other Bad Acts Evidence

¶53. Mississippi Rule of Evidence 404(b) provides that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith." M.R.E. 404(b). However, it may be admissible "for other purposes such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." *Id*.

¶54. Brown claims that evidence of acts such as the purchase of automobiles from guardianship funds and the "stealing" of $1.2 million dollars from the guardianship was

---

[18]For example, Brown asked Shackelford: "The checks that I could find on how much *I* had given you was 585, wasn't it?" (Emphasis added.)

44

inadmissible and irreparably prejudiced him. He also claims that he objected to this "bad act" evidence. He did not. After opening statements, Brown moved to dismiss the case, arguing that the prosecutor stated that Brown was being charged for embezzling one million dollars. The prosecutor said no such thing. He told the story of the guardianship, then explicitly stated that Brown was being charged with embezzlement on two counts, one count being the $300,000 check and the other being the $250,000 check. That is not an objection to bad acts evidence being inadmissible. In fact, the State filed a notice of intent to offer Rule 404(b) evidence and Brown did not respond or object. Brown did not file any motion in limine to exclude Rule 404(b) evidence. Brown did not make any contemporaneous objections at trial when such evidence was admitted or such testimony elicited. And Brown himself elicited testimony multiple times about the automobiles and the $1.2 million. Additionally, Brown's exhibits 2, 3, and 7, which he introduced into evidence himself, contained indications of other bad acts, including car purchases and property purchases from Thomas's fiancé. Thus, Brown clearly waived any objection to the admission of character evidence.[19] *See Smith v. State*, 986 So. 2d 290, 295 (Miss. 2008); *see also Singleton v.*

[19]Brown's claim is also without merit, and thus does not warrant plain error review. At its base level, the Rule 404(b) evidence admitted in this case is admissible to prove opportunity, intent, preparation, plan, knowledge, and absence of mistake or accident, thus falling within the majority of the Rule 404(b) exceptions to the inadmissibility of character evidence. Furthermore, when character evidence is "integrally intertwined" with the evidence of the crime, the State has a "legitimate interest in telling a rational and coherent story of what happened[.]" *Wheeler v. State*, 536 So. 2d 1347, 1352 (Miss. 1988).

One of Brown's main defenses was that the State had no proof that he deposited the $1 million check in his account before February 21, 2001. The State offered proof that Brown began writing checks to Blackwell Imports for cars on February 21, and wrote the loan check on February 22. The State also notes that the ward's funds were commingled with other funds in Brown's guardianship account, making it necessary to show what

45

***State***, 518 So. 2d 653, 655 (Miss. 1988) ("A defendant cannot complain on appeal of alleged errors invited or induced by himself.").

### 3. Jury Instructions

¶55.    While the State does not argue that Brown waived this issue, Brown did waive this issue by failing to raise it in his post-trial motions. ***Watts v. State***, 492 So. 2d 1281, 1291 (Miss. 1986).

¶56.    Brown argues that jury instruction S-4, regarding personal use, is a misstatement of the law.    He argues that the instruction ignores the specific intent requirement of embezzlement.  He further argues that instructions S-1A and S-2A, specifically the statement that "instead of depositing said funds into a guardianship account as he was legally obligated to do, he deposited said funds into a bank account owned and controlled by the defendant and styled 'Michael J. Brown, Attorney at Law, Escrow Account" (which is "number 4" in the elements instruction) is an improper statement of the law, as it criminalizes the deposit of the guardianship money into an escrow account.  Brown asserts that the mere deposit of funds into an escrow account by an attorney acting as a fiduciary does not constitute conversion.

¶57.    In addition to waiving his objection to S-1A and S-2A by failing to raise his objection in his post-trial motion, Brown also waived his objection to the particular language about

---

happened to various amounts of money.  Furthermore, the complete accountings for the guardianship accounts, which included all of the other checks written and the total monies for which Brown was responsible, were important pieces of evidence to tie the story together. The other acts regarding the guardianship money are so interrelated and intertwined, that much of the State's narrative regarding the charged offenses would not make sense without the evidence of other acts, especially in light of Brown's vigorous assertions that the funds did not come from guardianship money.

which he now complains in S-1A and S-2A by a failure to contemporaneously object to it.

As detailed, the trial court went to great pains, over multiple pages in the transcript, to parse out Brown's specific objections to these instructions. The trial court even went line by line through one of the instructions. When the judge read parts three and four of the elements instruction and asked Brown what objections he had to that part, he specifically objected only to part three, and not to the part now complained of on appeal. Indeed, Brown complained about most of the parts of the elements instruction, yet he did not complain about this particular portion at trial. Thus, Brown's failure to object to this portion of the instruction at the trial court level, especially after the trial court went to great pains to parse out Brown's specific objection(s) to the instruction, waives his objection.[20] *Harris v. State*, 861 So. 2d 1003, 1013 (Miss. 2003) ("To preserve a jury instruction issue on appeal, the defendant must

---

[20]Even if Brown is not deemed to have waived the jury instruction argument, his argument is without merit and is thus not subject to plain error review. "Jury instructions are to be read together and taken as a whole with no one instruction taken out of context." *Harris v. State*, 861 So. 2d 1003, 1012 (Miss. 2003) (quoting *Austin v. State*, 784 So. 2d 186, 192 (Miss. 2001)). Taken in pure isolation and out of context, perhaps one could argue that the one line complained of in S1-A and S2-A criminalize the simple placing of client funds in an escrow account; however, not only are there several other jury instructions, but S1-A and S2-A are two-page long instructions with several other phrases besides the one complained of. The phrase complained of is one of several elements, tracks the indictment, and, when read with the rest of the specific jury instruction, is in line with the statutory elements of possession, unlawful conversion, and "own use." This one element obviously does not criminalize the mere placing of client funds into an escrow account, as one need meet *all* the elements, not just one, to find that a crime was committed. Thus, the trial court did not err by including this phrase among the many in the elements instructions.

Brown did object to S-4 at trial. As discussed above, "own use" does not mandate a personal benefit. If a defendant gave money to someone else, but directed and controlled the disposition of such money, it meets the element of "own use." Thus, S-4 is a correct statement of the law, and the trial court did not err by granting it.

47

make a specific objection to the proposed instruction to allow the trial court to consider the issue.").

### 4. Restitution

¶58. Brown argues that the trial court acted improperly in sentencing him to pay $1.2 million in restitution. Brown did not object to his sentence contemporaneously, thus, the State argues that he waived this issue. Brown claims that his sentence was plain error, because it was illegal and beyond the authority of the trial court, arguing that the "trial court does not have the authority to require restitution above and beyond the amounts charged in the indictment. "If no contemporaneous objection is made at trial, a party must rely on the plain error rule to raise the assignment of error on appeal." *Flora v. State*, 925 So. 2d 797, 811 (Miss. 2006). The plain error doctrine applies when an error exists and that error caused a manifest miscarriage of justice. *Id.* "The plain error rule will only be applied when a defendant's substantive or fundamental rights are affected." *Id.* "[D]efendants have a fundamental, constitutional right to be free from illegal sentences," thus a challenge to the legality of a sentence raised for the first time on appeal may be reviewed for plain error. *Harris v. State*, 99 So. 3d 169, 172 (Miss. 2012).

¶59. Statutory law authorizes trial courts to sentence a defendant to restitution: "When a person is convicted of criminal activities which have resulted in pecuniary damages, in addition to any other sentence it may impose, the court may order that the defendant make restitution to the victim[.]" Miss. Code Ann. § 99-37-3 (Rev. 2015). The statutory language clearly indicates that the court has the authority to order restitution for pecuniary damages

48

that were a result of the convicted crimes. Brown was convicted of embezzling $550,000. It is obvious in this case that pecuniary damages in the amount of $550,000 resulted from those convicted crimes. However, no proof was offered that any more than the $550,000 in pecuniary damages *resulted from* the offenses of conviction.[21] The transcript indicates that the State requested at least $550,000 in restitution be ordered, and merely mentioned that the chancery court ordered Brown to repay $1.2 million. The $1.2 million ordered repaid by the chancery court reflected money used for cars, cash, and many other expenditures that certainly did *not* result from the specific embezzlement of the $550,000.

¶60. The State cites *Powell v. State* for the proposition that the restitution ordered was not in error because Brown failed to object. *Powell v. State*, 536 So. 2d 13 (Miss. 1988). In *Powell*, the defendant was convicted of aggravated assault for shooting the victim. *Id.* The judge determined that the victim had incurred nearly $10,000 in medical bills due to the assault, but the bills themselves were never introduced into evidence. *Id.* at 17. The Court found that it was error for the judge to use facts not in evidence to determine the amount of restitution, but declined to reverse the order of restitution because the defendant had failed to object contemporaneously. *Id.* The Court cited the restitution statute, which indicates

---

[21]Brown's argument that the trial court had no authority (in any circumstance) to order restitution in an amount greater than the amounts charged in the indictment goes too far. The statutory language is clear – the amount of restitution may be in the amount of pecuniary damages resulting from the convicted offense. It is certainly reasonable to imagine that the State could prove facts that pecuniary damage in an amount greater than the charged amounts resulted from the embezzlement. For example, if, in a case of embezzlement, the conversion of the money caused the victim's bank account to overdraft, incurring fees, the fees may be proven to be a result of the embezzlement and restitution therefor ordered. However, in this case, the State made no such showing.

that, as with any sentence to which a defendant objects, the defendant should object to restitution at the time of sentencing. Miss. Code Ann. § 99-37-3(3) (Rev. 2015). *Powell* is distinguishable because the trial judge clearly had the authority under the statute to order restitution for medical bills that *resulted from* the assault for which the defendant was convicted. In this case, the trial court had no authority to order restitution for pecuniary damages that were not a result of the convicted crimes, rendering Brown's sentence of restitution illegal. Therefore, this Court vacates the sentence of restitution and remands the case for resentencing as to any restitution.

## CONCLUSION

¶61. Brown's convictions were supported by sufficient evidence and were not against the great weight of the evidence. Ample evidence existed to show that the $550,000 in loans came out of guardianship funds, and the trial court applied the law correctly with regard to the "own use" element of the statute. Brown waived any objection to Rule 404(b) evidence being admitted at trial, and he waived any objection to the language in the jury instructions by failing to raise the issue in his post-trial motion. Regardless, both arguments are without merit. Thus, Brown's convictions and sentence to a term of years are affirmed. However, the trial court exceeded its sentencing authority in sentencing Brown to pay $1.2 million in restitution; thus, this Court vacates the restitution portion of Brown's sentence and remands the case for resentencing, in other words, for again determining restitution, consistent with this opinion.

¶62. **COUNT I: CONVICTION OF EMBEZZLEMENT AND SENTENCE OF TWENTY (20) YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED. COUNT II: CONVICTION OF EMBEZZLEMENT AND SENTENCE OF TWENTY (20) YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, WITH THE LAST TEN (10) YEARS TO BE SUSPENDED, AFFIRMED. SENTENCES IN COUNT I AND COUNT II SHALL RUN CONSECUTIVELY WITH EACH OTHER AND CONSECUTIVELY WITH THE SENTENCE IN CAUSE NUMBER 49908 IN RANKIN COUNTY CHANCERY COURT. SENTENCES IMPOSED HEREIN WILL NOT COMMENCE UNTIL THE APPELLANT HAS PURGED HIMSELF OF CONTEMPT OR IS OTHERWISE RELEASED FROM INCARCERATION BY THE RANKIN COUNTY CHANCERY COURT. APPELLANT IS NOT ELIGIBLE FOR ANY CREDIT FOR PRE-TRIAL INCARCERATION AGAINST THE SENTENCES IMPOSED. APPELLANT IS ELIGIBLE FOR FIVE (5) YEARS OF SUPERVISED PROBATION, UPON THE COURT'S STANDARD ORDER OF PROBATION. APPELLANT SHALL PAY COURT COSTS, FEES, AND ASSESSMENTS IN THE AMOUNT OF $421.50. SENTENCE OF RESTITUTION IS VACATED AND THE CASE IS REMANDED. CONVICTION OF THREE (3) COUNTS OF DIRECT CRIMINAL CONTEMPT OF COURT, DURING THE COURSE OF THE TRIAL, AND SENTENCE OF THIRTY (30) DAYS IN THE RANKIN COUNTY JAIL ON EACH COUNT, AFFIRMED. SENTENCES SHALL RUN CONSECUTIVELY WITH EACH OTHER FOR A TOTAL SENTENCE OF NINETY (90) DAYS. SENTENCES ALSO WILL RUN CONSECUTIVELY TO THE SENTENCES IN COUNT I AND COUNT II IMPOSED ABOVE.**

**WALLER, C.J., DICKINSON AND RANDOLPH, P.JJ., KITCHENS, CHANDLER AND COLEMAN, JJ., CONCUR. LAMAR, J., CONCURS IN PART AND IN RESULT WITHOUT SEPARATE WRITTEN OPINION. PIERCE, J., NOT PARTICIPATING.**

51